**Alberta LESSARD et al., Plaintiffs,**

v.

**Wilbur SCHMIDT et al., Defendants.**

**Civ. A. No. 71–C–602.**

United States District Court,
E. D. Wisconsin.

Oct. 18, 1972.

in West Allis, Wisconsin, and taken to the Mental Health Center North Division, Milwaukee, on October 29, 1971. At the Center, the police officers, defendants James D. Mejchar and Jack Schneider, filled out a form entitled "Emergency Detention for Mental Observation," following which Miss Lessard was detained on an emergency basis. On November 1, 1971, the same police officers appeared before defendant Judge Christ T. Seraphim, Milwaukee County Court, and restated the allegations contained in the petition for emergency detention. On the basis of this *ex parte* proceeding, Judge Seraphim issued an order permitting the confinement of Miss Lessard for an additional ten days. Thereafter, on November 4, 1971, defendant Dr. George Currier filed an "Application for Judicial Inquiry" with Judge Seraphim, stating that Miss Lessard was suffering from schizophrenia and recommending permanent commitment. At this time Judge Seraphim ordered two physicians to examine Miss Lessard, and signed a second temporary detention document, permitting Miss Lessard's detention for ten more days from the date of the order. This period was again extended on November 12, 1971. Neither Miss Lessard nor anyone who might act on her behalf was informed of any of these proceedings.

On November 5, 1971, Judge Seraphim held an interview with Miss Lessard at the Mental Health Center. At this interview, Judge Seraphim informed Miss Lessard that two doctors had been appointed to examine her and that a guardian *ad litem* would be appointed to represent her. He asked her if she wished to have her own doctor examine her. Miss Lessard replied that she had no physician. Miss Lessard was not told of this interview in advance and was given no opportunity to prepare for it. Following the interview, Judge Seraphim signed an order appointing Daniel A. Noonan, an attorney, as guardian *ad litem* for Miss Lessard.

Miss Lessard, on her own initiative, retained counsel through the Milwaukee

---

Robert H. Blondis and Thomas E. Dixon, Jr., Milwaukee Legal Services, Milwaukee, Wis., for plaintiffs.

Ward L. Johnson, Asst. Atty. Gen., Madison, Wis., for defendants Schmidt and Ganser.

George E. Rice, Deputy Corporation Counsel, Milwaukee, Wis., for defendants Currier, Pyle, Kennedy, and Seraphim.

Roger Walsh, Asst. City Atty. for West Allis, West Allis, Wis., for defendants Mejchar and Schneider.

Before SPRECHER, Circuit Judge, REYNOLDS, Chief District Judge and GORDON, District Judge.

SPRECHER, Circuit Judge.

Alberta Lessard was picked up by two police officers in front of her residence

Legal Services, on November 9 or 10. On November 15, 1971, at 2:00 P.M., Miss Lessard was notified that a commitment hearing had been scheduled for 8:30 A.M., the following morning. This hearing was adjourned and reset for November 24, 1971, in order to give Miss Lessard's attorney an opportunity to appear. Miss Lessard's request that she be allowed to go home during the interim was denied. At the November 24 hearing before Judge Seraphim, testimony was given by one of the police officers and three physicians and Miss Lessard was ordered committed for thirty additional days. Judge Seraphim gave no reasons for his order except to state that he found Miss Lessard to be "mentally ill." Although the hospital authorities permitted Miss Lessard to go home on an out-patient "parole" basis three days later, the thirty day commitment order has been extended for one month each month since November 24, 1971.

The present suit, brought as a class action on behalf of Miss Lessard and all other persons 18 years of age or older who are being held involuntarily pursuant to any emergency, temporary or permanent commitment provision of the Wisconsin involuntary commitment statute, was filed on November 12, 1971. Jurisdiction was claimed under 42 U.S.C. § 1983.[1] The complaint sought declaratory and injunctive relief against the enforcement of certain portions of Wis. Stat.Ann. §§ 51.02, 51.03 and 51.04, relating to the procedure for involuntary detention and commitment of persons alleged to be suffering from mental illness. The complaint sought a temporary restraining order restraining the officials involved from proceeding further against Miss Lessard or detaining her involuntarily for any additional length of time. A three-judge court was requested. In an order dated December 3, 1971, Judge Reynolds of the federal district court for the Eastern District of Wisconsin denied temporary relief but agreed that the substantial constitutional claims raised by the pleadings required the convening of a three-judge court. 28 U.S.C. § 2281.

Miss Lessard alleges that the Wisconsin procedure for involuntary civil commitment denied her due process of law in the following respects: in permitting involuntary detention for a possible maximum period of 145 days without benefit of hearing on the necessity of detention; in failing to make notice of all hearings mandatory; in failing to give adequate and timely notice where notice is given; in failing to provide for mandatory notice of right to trial by jury; in failing to give a right to counsel or appointment of counsel at a meaningful time; in failing to permit counsel to be present at psychiatric interviews; in failing to provide for exclusion of hearsay evidence and for the privilege against self-incrimination; in failing to provide access to an independent psychiatric examination by a physician of the allegedly mentally ill person's choice;[2] in permitting commitment of a person without a determination that the person is in need of commitment beyond a reasonable doubt; and in failing to describe the standard for commitment so that persons may be able to ascertain the standard of conduct under which they may be detained with reasonable certainty. Before turning to these issues we must dispose of a jurisdictional question.

---

1. 42 U.S.C. § 1983 provides:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. We will not deal with this issue inasmuch as Judge Seraphim asked counsel for plaintiff whether they wished an evaluation by an independent psychiatrist. The offer was refused.

## I.

 Defendants insist that this court lacks jurisdiction under the principles of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and the federal anti-injunction statute, 28 U.S.C. § 2283. The federal anti-injunction statute is inapplicable to suits under 42 U.S.C. § 1983. Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). The rationale of Younger v. Harris is also inapplicable to this case.

The Supreme Court in *Younger* severely limited the circumstances in which federal courts should intervene in pending state criminal prosecutions. But the court expressly disavowed extending the same limitations to intervention in pending state civil proceedings like those involved here. Younger v. Harris, 401 U.S. 37, 54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (Stewart, J., concurring). Since *Younger,* the court has on at least two occasions declined to dismiss federal actions brought while state civil proceedings were pending. Lynch v. Household Finance Corporation, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972) ; Mitchum v. Foster, *supra.* The basis for distinguishing between criminal and civil cases in applying principles of comity were summarized by Justice Stewart in *Younger:*

"Courts of equity have traditionally shown greater reluctance to intervene in criminal prosecutions than in civil cases. [Citations omitted.] The offense to state interests is likely to be less in a civil proceeding. A State's decision to classify conduct as criminal provides some indication of the importance it has ascribed to prompt and unencumbered enforcement of its law. * * * " 401 U.S. at 55 n. 2, 91 S. Ct. at 757.

Even if *Younger* were to apply to state civil actions, we do not believe that such an action existed under the circumstances shown here. Although notice had been filed with the sheriff and examining physicians, setting a hearing for involuntary commitment prior to the filing of the federal court action on November 12, 1971, plaintiff had no written notice of any "pending" proceeding at the time this action was instituted.

It is also open to doubt whether the state court "action" was the type of state court proceeding against which principles of federalism and comity have been directed. The Wisconsin Supreme Court has held that a civil commitment proceeding is not in the nature of a state court action. In re Brand, 251 Wis. 531, 30 N.W.2d 238, appeal dismissed, cert. denied, Brand v. Milwaukee County, 335 U.S. 802, 69 S.Ct. 34, 93 L.Ed. 359 (1948).

Furthermore, assuming that a state court action existed at the time this suit was filed, the proceedings against which this action are addressed have long since terminated and the existence of a right of appeal is speculative. In In re Brand, *supra,* the Wisconsin Supreme Court held that there was no right of appeal from a civil commitment proceeding. Although the statute has since been amended, the legislature did not specifically authorize an appeal. The lack of such a provision in the general civil commitment statute is in sharp contrast to the explicit appeal right provided under the Wisconsin Sex Crimes Act. Wis. Stat.Ann. § 975.16. If any right of appeal does exist, it arises under Wis. Stat.Ann. § 274.01(1) (1972 Supp.), which provides: "Except as otherwise provided the time within which a writ of error may be issued or an appeal taken to obtain a review by the supreme court of any judgment or order in any civil action or special proceeding in a court of record is limited to 3 months from service of notice of entry of such judgment or order or, if no notice is served, to 6 months from date of entry." An additional provision states that the above time limitations do not apply in cases in which a judgment is rendered against an insane person. However, since the very purpose for an appeal of a judgment of insanity is to challenge that determination, a reversal of

the judgment would presumably bring the time limitations into operation and the three or six month limitation would therefore be applicable. The order challenged here was entered on November 24, 1971; the time for appeal, if it ever existed, has therefore run.

In these circumstances it would be unjust to require the plaintiff to forego this suit. Principles of federalism and comity do not require this court to refuse to act when to do so would only discourage the assertion of federal constitutional rights and perhaps cause irreparable injury to persons subject to involuntary loss of freedom as the result of the challenged commitment procedure. *See* Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). We conclude that jurisdiction is proper under 42 U.S.C. § 1983.

## II.

■ The power of the state to deprive a person of the fundamental liberty to go unimpeded about his or her affairs must rest on a consideration that society has a compelling interest in such deprivation.[3] In criminal cases, this authority is derived from the police power, granted because of the necessity of protecting society from anti-social actions. This power is tempered with stringent procedural safeguards designed to protect the rights of one accused of crime, to assure that no one will be arrested except upon probable cause nor convicted of a crime except in conformity with these procedural rules. In civil commitment proceedings the same fundamental liberties are at stake. State commitment procedures have not, however, traditionally assured the due process safeguards against unjustified dep-

rivation of liberty that are accorded those accused of crime. This has been justified on the premise that the state is acting in the role of *parens patriae,* and thus depriving an individual of liberty not to punish him but to treat him. Additionally, it is said that the individual may be deprived of liberty under the police power because of society's need to protect itself against the potential dangerous acts of persons who, because of mental illness, are likely to act irrationally. The fact that "[i]f a sociologist predicted that a person was eighty per cent likely to commit a felonious act, no law would permit his confinement,"[4] but under the same circumstances a psychiatrist's recommendation of commitment is likely to be accepted, is sought to be justified on the basis of potential benefit to the one confined in a mental institution. In effect, the present action challenges the validity of this difference in treatment. In order to assess properly the claims of plaintiff, some general discussion of mental commitment procedures and the effects of civil commitment upon those committed is necessary.

## A.

The common law had little need to concern itself with questions of adequate procedure for involuntary confinement because public institutions for the mentally ill were virtually nonexistent. *See* 1 Blackstone, Commentaries 305 (Christian ed. 1827). In the colonies, parents and family were expected to care for their own mentally disabled. S. Brakel & R. Rock, The Mentally Disabled and the Law 4 (1971 ed.) [hereinafter cited as Brakel & Rock]. The first mental hospital in the United States was not es-

---

3. In this regard, a statement by John Stuart Mill is worth recalling:

"The only freedom which deserves the name, is that of pursuing our own good in our own way, so long as we do not attempt to deprive others of theirs, or impede their efforts to obtain it. Each is the proper guardian of his own health, whether bodily, *or* mental and spiritual. Mankind are greater gainers

by suffering each other to live as seems good to themselves, than by compelling each to live as seems good to the rest." Mill, On Liberty 18 (Gateway ed. 1962).

4. Comment, "Civil Commitment of the Mentally Ill," 79 Harv.L.Rev. 1288, 1290 (1966).

tablished until 1751, with few additional institutions being built until the middle of the nineteenth century. As a result of the lack of facilities and limited medical knowledge of methods of treatment, those confined were generally clearly deranged and violent.[5] Brakel & Rock, *supra*, at 5. A New York statute, enacted in 1788, distinguished between the "furiously madd" who were "so far disordered in their senses that they may be dangerous to be permitted to go abroad," and who could be confined upon the issuance of a warrant by two or more justices, and other "lunatics" who could be taken under the care and protection of friends and relatives. N.Y.Laws of 1788, ch. 31. Under these circumstances, few questions were likely to be raised regarding improper commitment.

Gradually, as more asylums were built, the number of persons committed increased, and confinement was not limited to the obviously dangerous. The change in attitude was reflected in the courts. In 1845, an inmate of a Massachusetts institution for the insane brought a habeas corpus action, alleging that his commitment was illegal. Matter of Josiah Oakes, 8 Law Rep. 123 (Mass. 1845). The Massachusetts Supreme Court held that

> "the right to restrain an insane person of his liberty is found in that great law of humanity, which makes it necessary to confine those whose going at large would be dangerous to themselves or others. . . . And the necessity which creates the law, creates the limitation of the law. The questions must then arise in each particular case, whether a patient's own

safety, or that of others, requires that he should be restrained for a certain time, and whether restraint is necessary for his restoration or will be conducive thereto. The restraint can continue as long as the necessity continues. This is the limitation, and the proper limitation."

*Id.* at 125. Dangerousness to self thus became an additional criterion upon which commitment could be based. This criterion apparently rested on an assumption that a state could proceed as *parens patriae* to protect the interests of the person involved. The doctrine could be justified as a derivation of an English law, under which the King was appointed the guardian of the person and goods of a lunatic.[6] A person found to be a lunatic was committed to the care of a friend who received an allowance with which to care for the unfortunate person. During "lucid moments" the incompetent was permitted to manage his own property, and to generally exercise his civil rights. He was also entitled to an accounting from the King. There was thus a very real difference between the English practice, which could only be for the benefit and protection of the incompetent, and which was only effective during periods of insanity, and the American innovation, which resulted in total, and perhaps permanent, loss of liberty.

Despite its differences with regard to fundamental rights, the *parens patriae* concept as formulated in *Oakes* could be justified on humanitarian motives arising from early American practices with regard to indigent incompetents. Deutsch has documented the perils of

---

5. *See* A. Deutsch, The Mentally Ill in America 419–20 (1949 ed.) [hereinafter cited as Deutsch]:

"Anyone could arrest a 'furiously insane' person, or one deemed 'dangerous to be permitted to be at large,' and confine him for the duration of his dangerous condition, provided that this was done in a humane manner. It was permitted to 'confine, bind and beat' him if his condition rendered it 'necessary.' Insane persons recognized as such (namely, the violent and the dangerous) were dealt with by the police powers."

6. The statute *De Praerogativa Regis* was enacted sometime between 1255 and 1290. Under this law, the King was granted custody of the lands of lunatics (those who had once been sane but had lost the use of their reason) and idiots (those who had been without reason from birth). Brakel & Rock, *supra*, at 2.

these unfortunates, who were expelled from towns along with paupers generally, and who wandered about in bands, subject to the whims and, sometimes, cruelties of a society that equated both mental illness and idleness with moral turpitude. Deutsch, *supra,* note 5, ch. 3; Brakel & Rock, *supra,* at 4. For these persons, it was undoubtedly more merciful to erect institutions, and to confine the mentally incapacitated for their own safety. They were helpless to survive for long outside of an institutional environment.

Unfortunately, neither the Massachusetts court in *Oakes,*[7] nor other courts to follow felt much concern for either a definition of "dangerousness" nor the effects of deprivations of liberty upon those committed. A Mrs. Packard, committed in 1860 under an Illinois statute which allowed married women and infants to be committed on the request of a husband or guardian, found it necessary to campaign vigorously for greater safeguards to involuntary commitment following her release from a state institution. Brakel & Rock, *supra,* at 8.

Mrs. Packard's efforts, and those of others, brought some reforms, principally in the form of statutes requiring that no one could be committed without a jury trial by one's peers. The erosion of the common law requirement of dangerousness continued, however, with the result that many statutes today permit commitment based upon a wide range of showings of "mental illness."[8] The constitutionality of these statutes has, for the most part, never been decided by the Supreme Court. State courts have divided in their opinions on almost all matters relating to the requirements of due process in involuntary commitment proceedings, disagreeing even as to the validity of statutes which have dispensed with the right to jury trial. *See* Brakel

& Rock, *supra,* at 54. It is at least clear that their justification cannot rest on common law precedent; the common law may have been lax in practice at times, but the basic standard for involuntary deprivation of liberty was perceived to be a stringent one.

### B.

██ The requirements of due process are not static; they vary depending upon the importance of the interests involved and the nature of subsequent proceedings. Legislative judgments as to procedural guarantees "are questions which the Constitution has entrusted at least in part to courts, and upon which courts have been understood to possess particular competence." In re Gault, 387 U.S. 1, 70, 87 S.Ct. 1428, 1466, 18 L.Ed. 2d 527 (1967) (Harlan, J., concurring & dissenting). With these considerations and the common law background of our present civil commitment laws in mind, we turn to the justifications for permitting civil commitment without the stringent safeguards required in criminal proceedings.

One justification for the relaxation of criminal due process standards, of recent vintage, is that involuntary incarceration carries with it a constitutional right to treatment. *See, e. g.,* Note, "The Nascent Right to Treatment," 53 Va.L. Rev. 1134, 1140 (1967): "Accepting that due process does not forbid involuntary detention for the purpose of rendering care and treatment under the *parens patriae* role, it is still clear that such detention does not meet due process requirements if, in actual practice, treatment beneficial to the patient is not rendered." The issue of a constitutional right to treatment is not before us. However, the difficulties of enforcing such a right have been well

---

7. Oakes was not released. He had been detained on charges that he suffered from hallucinations and unsound mind in the conduct of business affairs following his engagement to a young woman of unsavory character a few days after the death of his wife. Brakel & Rock note that this case was significant in the gradual erosion of the "old standard of 'detention of the violent.'" Brakel & Rock, *supra,* at 7.

8. The various state provisions under which a person may be civilly committed are listed in Brakel & Rock, *supra,* at 66–123.

documented. See, e. g., Wyatt v. Stickney, 334 F.Supp. 1341 (M.D.Ala.1971); Livermore et seq., "On the Justifications for Civil Commitment," 117 Pa.L.Rev. 75, 93 n. 53 (1968); Note, "The Nascent Right to Treatment," supra. Cf., Kent v. United States, 383 U.S. 541, 543, 86 S. Ct. 1045, 1048, 16 L.Ed.2d 84 (1966) ("Apart from raising questions as to the adequacy of custodial and treatment facilities and policies, some of which are not within judicial competence . . .").

Furthermore, the validity of the parens patriae role and the lifting of procedural safeguards in such instances appears to rest in part on the realities of better treatment for the person subjected to incarceration in a civil proceeding. In Kent v. United States, supra, the Supreme Court, discussing the issue in the context of juvenile courts, observed:

"The objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment. The State is parens patriae rather than prosecuting attorney and judge. But the admonition to function in a 'parental' relationship is not an invitation to procedural arbitrariness.

"2. Because the State is supposed to proceed in respect of the child as parens patriae and not as adversary, courts have relied on the premise that the proceedings are 'civil' in nature and not criminal, and have asserted that the child cannot complain of the deprivation of important rights available in criminal cases. It has been asserted that he can claim only the fundamental due process right to fair treatment. . . .

"While there can be no doubt of the original laudable purpose of juvenile courts, studies and critiques in recent years raise serious questions as to whether actual performance measures well enough against theoretical purpose to make tolerable the immunity of the process from the reach of constitutional guaranties applicable to adults. There is much evidence that some juvenile courts, . . . lack the personnel, facilities and techniques to perform adequately as representatives of the State in a parens patriae capacity, at least with respect to children charged with law violation. There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children."

Id. at 554–556, 86 S.Ct. at 1054 (emphasis added). Few persons familiar with the mental health field will question the applicability of much of the above to persons subjected to involuntary commitment in state institutions.[9]

In any event, the argument in favor of relaxed procedures on the basis of a subsequent right to treatment ignores the fact that unless constitutionally prescribed procedural due process requirements for involuntary commitment are met, no person should be subjected to "treatment" against his will. The argument also ignores the fact that many mental illnesses are untreatable. See, e. g., Livermore et seq., "On the Justifications for Civil Commitment," 117 Pa.L. Rev. 75, 93 (1966) (quoting psychiatric findings that recovery rates from long-term paranoid schizophrenia—the diagnosis given Miss Lessard's condition—are very low), and the substantial evidence that any lengthy hospitalization, particularly where it is involuntary, may greatly increase the symptoms of mental illness and make adjustment to society more difficult. See, e. g., Hearings before the Senate Subcommittee on Constitutional Rights, 91st Congress, 1st and 2d Sess., 214–15, 319, 409 (1969 and 1970) [hereinafter cited as 1970 Hearings].[10]

9. See section II C, infra.

10. Dr. Sherman Kieffer, Director, National Center for Mental Health Services, Training and Research, of St. Elizabeths Hospital, Washington, D.C., testified that "most mental illness can be treated more

A second justification for less stringent safeguards in civil commitment proceedings is simply that the proceedings are "civil" and not "criminal." That argument should have been laid to rest following the Supreme Court's decision in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), in which the Court found the distinction unpersuasive as an excuse for providing lesser safeguards for juveniles in delinquency proceedings than were given adults charged with violations of the criminal law. The only possible argument for a broad civil-criminal distinction in mental commitment proceedings is one based upon dicta in Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Robinson held invalid a statute which permitted a drug addict to be subjected to criminal penalties for being an addict. The Court held that a crime based upon status was cruel and unusual punishment, noting that the challenged law was not one "which even purports to provide or require medical treatment." Id. at 666, 82 S.Ct. at 1420. The Court went on to say:

"It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." Id.

Neither this language nor prior holdings of the Court in any way answer the question of what procedure and proof are required for a determination that a given individual is in need of treatment or confinement. The Court simply restated its prior holdings, in line with the common law and common understanding, that the state is free to protect its citizens from the effects of certain illnesses upon society-at-large. See, e. g., Jacobson v. Massachusetts, 197 U.S. 11, 27, 25 S.Ct. 358, 362, 49 L.Ed. 643 (1905) ("Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members."). Robinson does not, therefore, lend support to those who argue that fewer safeguards are constitutionally required in civil commitment proceedings than are required for other deprivations of liberty.

C.

Even a brief examination of the effects of civil commitment upon those adjudged mentally ill shows the importance of strict adherence to stringent procedural requirements and the necessity for narrow, precise standards.

An individual committed to a mental institution loses numerous civil rights. In Wisconsin, hospitalization for mental illness, whether by voluntary admission or involuntary commitment, raises a rebuttable presumption of incompetency. The presumption continues as long as the patient is under the jurisdiction of hospital authorities.[11] Wis.Stat.Ann. § 51.-005(2). An individual adjudged mentally ill in Wisconsin also faces restrictions on making contracts and limitations on the right to sue and be sued. See Wis.Stat.Ann. §§ 319.215, 260.22 (1972 Supp.), 262.06(2)(b) (1972 Supp.), 296.02, 893.33. Restrictions on licenses required to engage in certain professions also accompany an adjudica-

effectively when detected and diagnosed early and properly, and when the positive relationships between the individual and his family, his job, and his community are not severed." 1970 Hearings at 319.

11. Thus, while Miss Lessard was conditionally released soon after the commitment hearing, the renewed commitment orders each month result in a continued presumption of incompetency under Wisconsin law.

tion of mental illness in Wisconsin. Wis. Stat.Ann. § 441.07 (1972 Supp.) (registered and practical nurses), § 447.07(7) (1972 Supp.) (dentists and dental hygienists), § 256.286 (attorneys). Persons found mentally ill in Wisconsin are, like felons, unable to vote. Wis.Stat. Ann. §§ 6.03(1), 12.59; Wis.Const. art. 3, § 2.[12] The mentally ill are also prohibited from driving a car and serving on juries.

Wis.Stat.Ann. §§ 343.06(5), (7), 343.-25(4) (driving), 255.01 (jury service). No person found to be "insane, imbecile, or feeble-minded" may participate in a marriage contract. Wis.Stat.Ann. § 245.03.

It is obvious that the commitment adjudication carries with it an enormous and devastating effect on an individual's civil rights. In some respects, such as the limitation on holding a driver's license, the civil deprivations which follow civil commitment are more serious than the deprivations which accompany a criminal conviction.

In addition to the statutory disabilities associated with an adjudication of mental illness, and just as serious, are the difficulties that the committed individual will face in attempting to adjust to life outside the institution following release. The stigma which accompanies any hospitalization for mental illness has been brought to public attention in the news stories surrounding the recent resignation of a vice-presidential aspirant from further candidacy. Evidence is plentiful that a former mental patient will encounter serious obstacles in attempting to find a job, sign a lease or buy a house. One commenta-tor, noting that "former mental patients do not get jobs," has insisted that, "[i]n the job market, it is better to be an ex-felon than ex-patient." Testimony of Bruce J. Ennis, ACLU, New York City, 1970 Hearings at 284.

Perhaps the most serious possible effect of a decision to commit an individual lies in the statistics which indicate that an individual committed to a mental institution has a much greater chance of dying than if he were left at large. Data compiled in 1966 indicate that while the death rate per 1000 persons in the general population in the United States each year is only 9.5, the rate among resident mental patients is 91.8. Furman & Conners, Jr., "The Pennsylvania Experiment in Due Process," 8 Duquesne L.Rev. 32, 65–66 (1970). Figures for Wisconsin are similar. The study showed a death rate for the Wisconsin populace in general of 9.7 per 1000 population per year (or less than one per cent) and a death rate in Wisconsin mental institutions of 85.1 per thousand (or 8.51 per cent). *Id.* at 66.

Although part of this difference may be accounted for by a larger number of older persons in mental institutions, studies indicate that other factors also are involved. One factor is the smaller number of physicians per patient in public mental institutions in comparison to the ratio of doctors to individuals in the general population. In Wisconsin, in 1965, it is reported there was one physician for each 175 patients. Wisconsin thus ranked 46th among the 50 states in patient-physician ratios. 1970 Hearings at 646.[13] The median ratio in the Unit-

12. Wis.Stat.Ann. § 6.03(1)(a) disqualifies "any person under guardianship, non compos mentis, or insane" from voting. Wis.Stat.Ann. § 12.59(1) provides that: "Any person who shall vote at any general or special election, town meeting or election, school meeting or election, city, village or charter election, . . . having no right to vote by reason of disfranchisement or other disqualification at the time and place of such election, or who shall cause or procure his registration by any board of registry as a legal voter in any election district, when he shall not at the time have the requisite qualifications to entitle him to be registered in such district, . . . shall be imprisoned in the state prison not more than 3 years nor less than one year or in the county jail not more than one year, or fine [sic] not exceeding $200."

13. At the other extreme, in 1966, Wisconsin ranked 5th in the nation in the percentage of persons in the population

ed States in that year was one physician for 102 patients. These figures may be contrasted with the minimum standards for staff-patient ratios set by the American Psychiatric Association, which recommends one physician for every 30 patients for admission and intensive treatment facilities and one physician for 150 patients for continued treatment services. Am. Psych. Assn., Standards for Hospitals & Clinics (1956 ed., rev. 1958), 1970 Hearings at 365.

In summary, an adjudication of mental illness in Wisconsin carries with it loss of basic civil rights and loss of future opportunities. The damage done is not confined to a small number among the population. In 1963, 679,000 persons were confined in mental institutions in the United States; only 250,000 persons were incarcerated in all prisons administered by the states and federal government. Cohen, "The Function of the Attorney and the Commitment of the Mentally Ill," 44 Texas L.Rev. 424, 432–433 (1966). It would thus appear that the interests in avoiding civil commitment are at least as high as those of persons accused of criminal offenses. The resulting burden on the state to justify civil commitment must be correspondingly high. We turn to the specific practices challenged by the plaintiffs in this case.

### III.

### A.

### Notice and an Opportunity to be Heard

■ Plaintiffs challenge the constitutionality of the sections of the Wisconsin civil commitment statute which permit involuntary detention for a possible total of 145 days without a hearing,[14] which fail to provide for meaningful notice and which allow the court to dispense with notice at all in cases in which notice is deemed "injurious or without advantage" to the patient.[15] We believe sections 51.02(1), 51.03, and 51.-04(1), (2), and (3) are unconstitutional on their face and as applied to the named plaintiff in this action, Alberta Lessard.[16]

committed to state hospitals, with 319.8 persons per 100,000 population hospitalized. The nation's average that year was 237.9 persons, with a median of 214.6 persons in institutions per 100,000 persons in the general population. 1970 Hearings at 647.

14. Section 51.04(1) permits a five-day involuntary detention of "any person who is violent or who threatens violence and who appears irresponsible and dangerous." Under § 51.04(2) the court may require an additional ten-day detention of any person "if it appears from the application for his mental examination or otherwise that safety requires it." Section 51.04(3) permits a further 30-day detention, which may be extended to 90 days. A person may therefor be detained a total of 105 days without any hearing at all. If the patient requests a jury trial under § 51.03 the period may be extended another 40 days, for a total of 145 days.

15. Wis.Stat.Ann. § 51.02(1)(a) provides:
"On receipt of the application or of the report of the examining physicians, the court shall appoint a time and place for hearing the application and shall

cause notice thereof to be served upon the patient . . . , which notice shall state that application has been made for the examination into his mental condition (withholding the names of the applicants) and that such application will be heard at the time and place named in the notice; but if it appears to the satisfaction of the court that the notice would be injurious or without advantage to the patient by reason of his mental condition, the service of notice may be omitted. The court may, in its discretion, cause notice to be given to such other persons as it deems advisable. If the notice is served the court may proceed to hold the hearing at the time and place specified therein; or, if it is dispensed with, at any time."
The validity of the provision permitting the withholding of names of the applicants is not contested here. See, however, Willner v. Committee on Character & Fitness, 373 U.S. 96, 103–104, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963).

16. Miss Lessard was detained in the Milwaukee County Mental hospital for 16 days before she was given any hearing and 26 days before a full hearing on the

Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971), established that an individual must "be given an opportunity for a hearing before he is deprived of any significant property interest . . . ." The individual's interest in liberty is even more compelling than his interest in property rights; it follows that no significant deprivation of liberty can be justified without a prior hearing on the necessity of the detention. Clearly, involuntary confinement in a mental institution for 16 or 26 days is a significant deprivation of liberty, and one which cannot be permitted under our Constitution without a hearing.

It can be argued that no deprivation of liberty is permissible under the due process clause without a prior hearing. We think, however, that the state may sometimes have a compelling interest in emergency detention of persons who threaten violence to themselves or others for the purpose of protecting society and the individual. *Cf.*, Boddie v. Connecticut, *supra*, 401 U.S. at 377–378, 91 S.Ct. 780. Such an emergency measure can be justified only for the length of time necessary to arrange for a hearing before a neutral judge at which probable cause for the detention must be established. The individual detained and members of his family must be given notice of this hearing and attendance by the detained party cannot be waived.

We do not decide the precise time when this hearing must take place. The Wisconsin legislature may decide that a preliminary hearing should be held within a much shorter time than that required by this decision. We set down only the minimum standards which we believe are required by the due process clause. In this connection, we believe that the maximum period which a person may be detained without a preliminary hearing is 48 hours. It must be remembered that at this time the necessity for commitment of an individual has not yet been established. Those who argue that notice and a hearing at this time may be harmful to the patient ignore the fact that there has been no finding that the person is in need of hospitalization.[17] The argument also ignores the fact that even a short detention in a mental facility may have long lasting effects on the individual's ability to function in the outside world due to the stigma attached to mental illness.[18]

There is no necessity for us to determine at the present time the precise nature of the hearing that is required. "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." Boddie v. Connecticut, *supra*, 401 U.S. at 378, 91 S.Ct. at 786. The importance of the in-

---

validity of her detention. She received notice of the November 16 hearing only 18 hours prior to the scheduled hearing. The notice gave no information other than date, time and place of the hearing.

17. *See, e. g.*, Maniaci v. Marquette University, 50 Wis.2d 287, 184 N.W.2d 168 (1971), an action for false imprisonment by a 16-year old girl who was held in the Milwaukee County General Hospital overnight under the authority of the Wisconsin emergency civil commitment provisions for the purpose of detaining her until her parents could be notified of her intention to leave a university.

18. The effects may not be limited to those resulting from prejudice. Consider the testimony of Arthur Cohen, National Capital Area Civil Liberties Union and American Civil Liberties Union, 1970 Hearings, at 210:

"Although 7 days may not appear to some to be a very long time, experience has indicated that any kind of forcible detention of a person in an alien environment may seriously affect him in the first few days of detention, leading to all sorts of acute traumatic and iatrogenic symptoms and troubles. By 'iatrogenic' I mean things that are caused by the very act of hospitalization which is supposed to be therapeutic; in other words, the hospitalization process itself causes the disturbance rather than the disturbance requiring hospitalization."

**1092**

terests involved in this situation are of the highest, in that the deprivation of liberty necessarily is one based on status and not on the alleged commission of an act deemed criminal by society. *Cf.*, Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The exigency of the situation, encompassing an emergency situation and lack of time to marshal all facts necessary to an ultimate determination, however, precludes a requirement that a hearing at this time encompass all requirements which may be deemed essential at a subsequent hearing. Furthermore, "subsequent proceedings" should rectify any shortcomings in this preliminary procedure. We note, though, that due process is not accorded by an *ex parte* hearing in which the individual has no meaningful opportunity to be heard either because of incapacity caused by medication [19] or lack of counsel.[20]

The preliminary hearing, concluded upon a showing of probable cause for believing the patient is in need of commitment within the constitutionally required sense of that definition,[21] does not justify a prolonged period of confinement without a full hearing on the necessity of continued confinement. This hearing must be held as soon after detention as possible within the limits made necessary in order for psychiatrists to make their examination and reports and for the patient to be able to prepare any defense. There does not seem to be any reason why psychiatrists cannot be scheduled to make their examinations within two or three days of the patient's entering the hospital, particularly when the examinations consist, as in Miss Lessard's case, of ten or fifteen minute interviews. Even if more thorough examinations were to begin to be made there is surely no need for the twenty-six day lapse between detention and hearing which occurred in the instant case. We believe that from ten to fourteen days should be the maximum period which an individual can be detained without a full hearing. If the facilities of the state hospitals do not permit full examination within this period because of inadequate personnel, it is difficult to see how continued detention can be said to be beneficial to the patient.[22]

Notice of the scheduled hearing, "to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded," and it must set forth the basis for detention with particularity. In re Gault, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527 (1967). Notice of date, time and place is not satisfactory. The patient should be informed of the basis for his detention, his right to jury trial, the standard upon which he may be detained,[23] the names of examining physicians and all other persons who may testify in favor of his continued detention, and the substance of their proposed testimony.

19. *See* 1970 Hearings at 426: "Often it is the drugs themselves which are responsible for 'crazy' behavior. Tranquilizers often give people a blank starey look and make them slow in responding to questions."

20. *See* part III C *infra*.

21. *See* part III B *infra*.

22. The inadequacies of mental commitment examinations in general have been noted by Dr. David J. Vail, Medical Director, Department of Public Welfare, State of Minnesota, 1970 Hearings at 72:

"If you are pleading insanity as a defense against prosecution for a crime, especially murder, you can be assured of a very thorough examination as to your mental condition. If you are applying for mandatory compensation on the grounds that mental illness has been inflicted on you—let us say as a war veteran—you can be assured of a very thorough examination as to your mental condition.

"But if you are an ordinary citizen and someone else has filed a petition asking for your commitment to a mental hospital as a mentally ill person, you will be lucky to have a 15-minute interview with two general medical practitioners and the service of a court-appointed attorney."

23. *See* part III B *infra*.

Judged by these standards, the Wisconsin statutory scheme for involuntary civil commitment fails to afford persons alleged to be mentally ill with adequate procedural safeguards. The sections are not saved by their application in Miss Lessard's case. Miss Lessard was given no opportunity to prepare in advance of the scheduled hearing, thus making it necessary to reschedule the hearing ten days later. She was given no notice of the names of persons who would testify against her, no notice of her right to jury trial, and no notice of the basis upon which her continued detention would be sought. Neither was she given any preliminary hearing in which she had an opportunity to challenge the probable cause for her confinement.

### B.

### Standards for Commitment

▇▇▇ Under Wis.Stat.Ann. § 51.02(5), the court may order a patient involuntarily committed if it is "satisfied that he is mentally ill or infirm or deficient and that he is a proper subject for custody and treatment. . . . " Plaintiffs contend that § 51.02(5) is vague and overbroad, denies those subjected to commitment under the section fundamental rights in that it leaves no room for the concept of less drastic means, and allows the judge or jury to commit upon a finding of mere preponderance of the evidence. We believe the statute can be interpreted to avoid a constitutional adjudication on the questions of vagueness, overbreadth and availability of less restrictive alternatives. We agree that, to the extent the statute permits a judge or jury to commit a person upon a preponderance of the evidence, it violates fundamental notions of due process.

▇▇▇ Wisconsin defines "mental illness" as "mental disease to such extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of others, or of the community." Wis.Stat.Ann. § 51.75, Art. II(f) (1971 Supp.). Interpreting § 51.-02(5) in the light of this provision in Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972), the Supreme Court noted (in dicta) that implicit in this definition is the requirement that a person's "potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty." In other words, the statute itself requires a finding of "dangerousness" to self or others in order to deprive an individual of his or her freedom. The Court did not directly address itself to the degree of dangerousness that is constitutionally required before a person may be involuntarily deprived of liberty. However, its approval of a requirement that the potential for doing harm be *great enough* to justify such a *massive curtailment* of liberty" implies a balancing test in which the state must bear the burden of proving that there is an extreme likelihood that if the person is not confined he will do immediate harm to himself or others. Although attempts to predict future conduct are always difficult, and confinement based upon such a prediction must always be viewed with suspicion, we believe civil confinement can be justified in some cases if the proper burden of proof is satisfied and dangerousness is based upon a finding of a recent overt act, attempt or threat to do substantial harm to oneself or another. *See* Cross v. Harris, 135 U.S.App.D.C. 259, 418 F.2d 1095, 1102 (1969).[24]

24. Even an overt attempt to substantially harm oneself cannot be the basis for commitment unless the person is found to be 1) mentally ill and 2) in immediate danger at the time of the hearing of doing further harm to oneself. The considerations which permit society to detain those who because of mental illness are likely to harm others do not necessarily apply to potential harm to oneself. *See, e. g.,*

Livermore, et seq., "On the Justifications for Civil Commitment," 117 Pa.L.Rev. 75, 94 "Case 8" (1968). Recent amendments to the California civil commitment statute appear to recognize this basic distinction. *See* Cal.Welf. & Inst'ns Code §§ 5260, 5264 and 5300 (West Supp.1970).

Furthermore, to say that attempted suicide must always be the product of

The necessity of a finding of imminent danger to oneself or others is strengthened by a comparison to persons incapacitated by physical illness. Persons in need of hospitalization for physical ailments are allowed the choice of whether to undergo hospitalization and treatment or not. The same should be true of persons in need of treatment for mental illness unless the state can prove that the person is unable to make a decision about hospitalization because of the nature of his illness. It is certainly true that many people, maybe most, could benefit from some sort of treatment at different periods in their lives. However, it is not difficult to see that the rational choice in many instances would be to forego treatment, particularly if it carries with it the stigma of incarceration in a mental institution, with the difficulties of obtaining release, the curtailments of many rights, the interruption of job and family life, and the difficulties of attempting to obtain a job, drivers license, etc. upon release from the hospital.

The dangers in allowing commitment without a finding of dangerousness are also exemplified by any examination of attempts to define mental illness. One group of authors, discussing the problem, noted:

"Obviously, the definition of mental illness is left largely to the user and is dependent upon the norms of adjustment that he employs. Usually the use of the phrase 'mental illness' effectively masks the actual norms being applied. And, because of the unavoidably ambiguous generalities in which the American Psychiatric Association describes its diagnostic categories, the diagnostician has the ability to shoehorn into the mentally diseased class almost any person he wishes, for whatever reason, to put there."

Livermore, et seq., "On the Justifications for Civil Commitment," 117 Pa.L.Rev. 75, 80 (1968).

This leaves the question of what standard of proof is required to prove that an individual is "mentally ill" and a "proper subject for custody and treatment," i. e., treatable and "dangerous." The Wisconsin statute is silent on the burden of proof required, but the Wisconsin Supreme Court has approved jury instructions which allowed a jury to commit a person upon a preponderance of the evidence. In re Hogan, 232 Wis. 521, 287 N.W. 725 (1939).

The determination of the appropriate burden of proof "is the kind of question which has traditionally been left to the judiciary to resolve." Woodby v. Immigration & Naturalization Service, 385 U.S. 276, 284, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966). The Supreme Court has stated in regard to the deprivation of liberty involved in deportation that it is impermissible for an individual to be "banished from this country upon no higher degree of proof than applies in a negligence case." Woodby, supra, at 285, 87 S.Ct., at 487. The deprivation of freedom involved in civil commitment is greater than that involved in deportation. The deported person may still have his family with him, may take up new citizenship and vote in elections, travel unfettered where he wishes for the most part, make contracts and marry and hold a job. The person confined in a Wisconsin mental institution is deprived of all of these rights. Civil commitment cannot, therefore, be justified upon a mere preponderance of the evidence.

There remains the formulation of a permissible standard. In Woodby, supra, the Supreme Court annouced a standard of "clear, unequivocal, and convincing evidence." Judge Sobeloff concurring and dissenting in Tippett v. Maryland, 436 F.2d 1153, 1165–1166 (4th Cir. 1971),

an irrational mind would seem to imply that no one could be punished for murder or its attempt. Yet we have always believed that persons are capable of rationally making the decision to intentionally take another person's life.

cert. dismissed as improvidently granted sub nom., Murel v. Baltimore City Criminal Court, 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972), suggested that the same standard might be appropriate on the issue of dangerousness in a defective delinquency proceeding. He would require proof beyond a reasonable doubt of all objective facts in dispute as well as of any incidents relied upon by psychiatrists in reaching their recommendation. Tippett v. Maryland, *supra,* at 1165. *See also* Dixon v. Attorney General of Pennsylvania, 325 F. Supp. 966, 974 (M.D.Pa.1971) ("[T]he evidence found to be reliable by the factfinder must establish clearly, unequivocally and convincingly that the subject of the hearing requires commitment because of manifest indications that the subject poses a present threat of serious physical harm to other persons or to himself.").

At least one court would require proof beyond a reasonable doubt on all questions relating to civil commitment. Denton v. Commonwealth, 383 S.W.2d 681 (Ky.1964). In In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Supreme Court held that proof beyond a reasonable doubt was required to prove every fact necessary in juvenile delinquency proceedings, noting that "extreme caution in factfinding," *id.* at 365, 90 S.Ct. 1068, is necessary because of "the possibility that [the individual] may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction." *Id.* at 363, 90 S.Ct. at 1072. The Court reiterated its previous holding in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 2d 527 (1966), that "civil labels and good

intentions do not themselves obviate the need for criminal due process safeguards in juvenile courts, for '[a] proceeding where the issue is whether the child will be found to be "delinquent" and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution.' " In re Winship, *supra,* 397 U.S. at 365–366, 90 S.Ct. at 1073.[25] The *Winship* Court reached its conclusion despite its findings that an adjudication of delinquency "does not deprive the child of his civil rights, and that juvenile proceedings are confidential." *Id.* at 366, 90 S.Ct. at 1074.

The argument for a stringent standard of proof is more compelling in the case of a civil commitment in which an individual will be deprived of basic civil rights and be certainly stigmatized by the lack of confidentiality of the adjudication. We therefore hold that the state must prove beyond a reasonable doubt all facts necessary to show that an individual is mentally ill and dangerous.

Even if the standards for an adjudication of mental illness and potential dangerousness are satisfied, a court should order full-time involuntary hospitalization only as a last resort. A basic concept in American justice is the principle that "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

25. Justice Harlan, in a concurring opinion, stated:

"When one assesses the consequences of an erroneous factual determination in a juvenile delinquency proceeding in which a youth is accused of a crime, I think it must be concluded that, while the consequences are not identical to those in a criminal case, the differences will not support a distinction in the standard of proof. First, and of paramount importance, a factual error here,

as in a criminal case, exposes the accused to a complete loss of his personal liberty through a state-imposed confinement away from his home, family, and friends. And, second, a delinquency determination, to some extent at least, stigmatizes a youth in that it is by definition bottomed on a finding that the accused committed a crime."

In re Winship, *supra,* 397 U.S. at 373–374, 90 S.Ct. at 1077–1078.

*See* Griswold v. Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Cross v. Harris, 135 U.S.App. D.C. 259, 418 F.2d 1095, 1102–1103 (1969). Perhaps the most basic and fundamental right is the right to be free from unwanted restraint. It seems clear, then, that persons suffering from the condition of being mentally ill, but who are not alleged to have committed any crime, cannot be totally deprived of their liberty if there are less drastic means for achieving the same basic goal. In Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F.2d 657, 660 (1966), the court ruled that the state should "bear the burden of exploration of possible alternatives" to commitment. We believe that the person recommending full-time involuntary hospitalization must bear the burden of proving (1) what alternatives are available; (2) what alternatives were investigated; and (3) why the investigated alternatives were not deemed suitable. These alternatives include voluntary or court-ordered out-patient treatment, day treatment in a hospital, night treatment in a hospital, placement in the custody of a friend or relative, placement in a nursing home, referral to a community mental health clinic, and home health aide services.

The commitment hearing judge's duty to comply with this mandate does not conflict with the Wisconsin civil commit-ment statute. Wis.Stat.Ann. section 51.-02(5) provides that at the conclusion of the hearing on mental condition the court *"may . . .* (c) Order him committed *if satisfied that he is mentally ill . . .* and that he is a proper subject for custody and treatment *. . ."* Section 51.05 states that "if the court or jury finds that the patient is mentally ill or infirm and *should* be sent to a hospital for the mentally ill or infirm, the court shall commit him to a hospital *. . ."*

We now turn to the procedure followed in the commitment hearing of the named plaintiff in this action, Alberta Lessard. At the close of the hearing held 26 days after Miss Lessard was initially detained, Judge Seraphim ordered her committed for an additional 30 days to the Milwaukee County Mental Health Center. Although the hospital authorities released her conditionally three days later, Judge Seraphim's order has been extended for 30-day periods each month subsequent to this hearing.[26] In the course of the November 24 hearing, Miss Lessard requested that the judge permit her to go home and agreed that if this were allowed she would seek treatment voluntarily on an out-patient basis. Judge Seraphim denied her request without giving a basis for his decision. Neither did the judge give a basis for his decision to commit except to state that he was "finding that she is mentally ill."[27] He made no find-

26. During the year following such release the patient may be summarily returned if "it becomes unsafe or improper to allow him to remain at large." Wis.Stat. Ann. § 51.13(1). *Compare* Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

Regarding the length of time Miss Lessard was actually confined in the hospital, *see* Robinson v. California, 370 U.S. 660, 667, 82 S.Ct. 1417, 1421, 8 L.Ed.2d 758 (1962): "To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold."

27. A review of the record indicates that Judge Seraphim thought that he need only find "probable cause" for believing Miss Lessard to be mentally ill. R. 41. The judge apparently based his decision on a belief that she had been previously convicted of making telephone calls to Marquette University, information which "the Court should certainly not overlook," R. 66, and an overwhelming reliance on medical opinion. *See* R. 49: "The Court: That's the dilemma the Court faces and that's why the Court relies on medical testimony in arriving at its decision, where the doctor makes his final conclusion that the person needs hospitalization and treatment." Such a basis for commitment flies in the face of the Supreme Court pronouncement in Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972), that "Wisconsin conditions such confinement not solely on the medical judgment

ing on dangerousness despite the fact that all of the evidence that she had attempted "suicide" 26 days earlier was of a hearsay character and the fact that Dr. Kennedy, staff psychiatrist at the mental hospital, testified that in his opinion she had no present suicidal tendencies.[28]

There is no indication in the record that the judge considered alternative methods of treatment which would have a less drastic effect on the curtailment of Miss Lessard's freedom and civil liberties; in fact, the little evidence in the record indicates that he refused to consider less restrictive alternatives. Finally, the record gives no indication whether the judge found the existence of a need for confinement beyond a reasonable doubt or by a preponderance of the evidence or by any standard whatsoever.

It is apparent that statutory and constitutional requirements for civil commitment were not followed in the named plaintiff's commitment hearing. Miss Lessard is entitled to an injunction against the further enforcement of the Wisconsin civil commitment statute against her and a declaratory judgment that her commitment was invalid on any of the bases discussed in this portion of the opinion.

## C.

### Right to Counsel

The Wisconsin civil commitment statute has no provision providing for a right to counsel. The statute does provide for the appointment of a guardian *ad litem* in the discretion of the court. Wis.Stat.Ann. § 51.02(4). Elsewhere, it is required that the guardian be an attorney. Wis.Stat.Ann. § 256.48. Nowhere is there any indication of the role which the guardian is to play in the proceedings. The record in this case makes clear, however, that the guardian does not view his role as that of an adversary counsel, and thus cannot take the place of counsel unless his role is restructured.

There seems to be little doubt that a person detained on grounds of mental illness has a right to counsel, and to appointed counsel if the individual is indigent. In Heryford v. Parker, 396 F. 2d 393 (10th Cir. 1968), Chief Judge Murrah compared the situation of a mental deficient to the juvenile delinquency procedure involved in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 2d 527 (1967), and held:

"[L]ike Gault, and of utmost importance, we have a situation in which the liberty of an individual is at stake, and we think the reasoning in Gault emphatically applies. It matters not whether the proceedings be labeled 'civil' or 'criminal' or whether the subject matter be mental instability or juvenile delinquency. It is the likelihood of involuntary incarceration—whether for punishment as an adult for a crime, rehabilitation as a juvenile for delinquency, or treatment and training as a feeble-minded or mental incompetent—which commands ob-

that the defendant is mentally ill and treatable, but also on the social and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty." The court's alternative reliance on a supposed previous conviction is similarly suspect. There is nothing in the record before us concerning such a conviction and it is highly questionable whether conviction for a crime may be even the partial basis for a civil commitment. The only other evidence related to Miss Lessard's belief that the National Education Association is infiltrated by Communists, a belief which, whether or not valid, is shared by others whom no one appears to have accused of being mentally ill. *See* Stormer, None Dare Call It Treason 122–23 (1964).

28. His testimony was as follows:
"Q . . . Do you think, or are you of the opinion that Miss Lessard presently has suicidal tendencies?
"A I am of the opinion that Alberta Lessard presently does not have suicidal tendencies today.
"Q And do you know of any present tendency on the part of Miss Lessard to harm other members of society?
"A I know of no plans on the part of Miss Alberta Lessard to harm any other members of society." R. 51.

servance of the constitutional safeguards of due process. Where, as in both proceedings for juveniles and mentally deficient persons, the state undertakes to act in parens patriae, it has the inescapable duty to . . . see that a subject of an involuntary commitment proceedings is afforded the opportunity to [have] the guiding hand of legal counsel at every step of the proceedings, unless effectively waived by one authorized to act in his behalf."

396 F.2d at 396.

The importance of counsel has also been stressed in the American Bar Foundation report on the mentally ill. Brakel & Rock, *supra,* at 62. Recently, the Supreme Court extended the right to appointed counsel to all criminal proceedings in which an accused is deprived of his liberty, noting, once again, that "the right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." Argersinger v. Hamlin, 407 U.S. 25, 31, 92 S.Ct. 2006, 2009, 32 L.Ed.2d 530 (1972), quoting from Powell v. Alabama, 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Chief Justice Burger, concurring in the result, remarked that "cogent factors suggest the infirmities in any approach that allows confinement for any period without the aid of counsel at trial; any deprivation of liberty is a serious matter." 407 U.S. at 41, 92 S.Ct. at 2014. As the Court noted in *Gault, supra,* 387 U.S. at 36, 87 S.Ct. at 1448, the individual whose freedom is in jeopardy, "needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and *to prepare and submit it.*" We therefore hold that an individual sought to be detained on grounds of mental illness has the right to counsel, including appointed counsel if the individual states that he is unable to afford counsel.

The state argues, however, that Wisconsin does provide for counsel in the person of the guardian *ad litem.* As noted earlier, the statute leaves the appointment of a guardian to the discretion of the court. Since, in the named plaintiff's case, a guardian was appointed, she probably lacks standing to contest the discretionary aspects of this statute. We think it is important, however, to discuss the state's contention that appointment of a guardian *ad litem* may displace a requirement of appointed counsel. Judge Seraphim did not appoint a guardian for Miss Lessard until November 5, 1971, one week after her initial detention. The attorney appointed as guardian at this time clearly did not see his role as that of defense counsel. At the initial hearing on November 16, 1971 (subsequent to the time Miss Lessard had retained the services of a legal aid attorney on her own initiative), when asked if he wished an adjournment, the guardian replied (R. 3):

"MR. NOONAN: My position at this time, as guardian ad litem and protector of her legal interests, I would recommend an adjournment in view of the fact that I think she has requested the services of an attorney.

"THE COURT: You mean Mr. Blondis has asked you to ask for an adjournment?

"MR. NOONAN: He has asked me, but my independent decision on it is that I should ask because I think she should be represented by an attorney."

A ten day adjournment was subsequently set by the judge. Miss Lessard protested having to spend another ten days in the institution and Mr. Noonan, her guardian, rather than seeking Miss Lessard's interim release or at least the possibility of a shorter interval between the two hearings, responded:

"MR. NOONAN: There are some very important issues here that you should consult with your attorney about before allowing this hearing to proceed, and it's within the judge's discretion to run his court properly and expediently, and he must set the court calendar. If he says ten days you are stuck with it even though it may cause you some immediate inconvenience."

A recent study of the Wisconsin civil commitment procedures supports our belief that the guardian and representative attorney occupy separate roles. The study concluded: "In present practice, it seems clear that in almost all cases where a guardian is appointed he sees his role not as an advocate for the prospective patient but as a traditional guardian whose function is to evaluate for himself what is in the best interests of his client-ward and then proceed, almost independent of the will of the client-ward, to accomplish this." Dix, "Hospitalization of the Mentally Ill in Wisconsin: A Need For a Reexamination," 51 Marquette L.Rev. 1, 33 (1967). Other studies have reached the same conclusion. See, e. g., Gupta, "New York's Mental Health Information Service: An Experiment in Due Process," 25 Rutgers L.Rev. 405, 438 (1971); Cohen, "The Function of the Attorney and the Commitment of the Mentally Ill," 44 Tex.L. Rev. 424 (1966). The Gupta findings in a study of the disposition of fifty-five cases in New York show overwhelmingly the importance of representative counsel for those who wish to contest commitment. Of the fifty-five cases studied, seven resulted in discharges by the court, five patients were discharged by psychiatrists, and the rest were committed:

> "All seven court discharges, and five by psychiatrists during adjournments, were in cases in which patient's counsel had been seeking his client's discharge. In the remaining six cases in which counsel was seeking discharge, four patients were committed for periods of less than three months, and only two were committed for six months. On the other hand, except for a geriatric patient discharged by a psychiatrist, the remaining patients (thirty-six) were all committed to mental hospitals. There could well be other reasons for such dispositions; but there is a

certain correlation between a demand by patient's counsel that he be discharged and the eventual outcome. All ten patients whose counsel showed agreement with the psychiatric recommendation of hospitalization were committed. None of the twenty patients whose counsel had made no clear-cut recommendation to the court for either discharge or hospitalization was discharged. One might fairly conclude that intervention by counsel acting as patient's attorney tremendously increases chances of discharge, not to mention the other alternatives to hospitalization that may also be worked out to the patient's satisfaction."

Gupta, *supra*, at 438. We think it apparent, therefore, that appointment of a guardian *ad litem* cannot satisfy the constitutional requirement of representative counsel.

The more important question in this action relates to the role of counsel in the proceedings inasmuch as Miss Lessard retained counsel prior to the commencement of the judicial hearing on commitment. The plaintiffs insist that one charged with mental illness has a right to counsel at every step of the procedure, including interviews with psychiatrists. We agree that the importance of the interests involved make imperative the assistance of counsel as soon after proceedings are begun as is realistically feasible.[29] Certainly the detained individual must have counsel at the preliminary hearing on detention,[30] with time enough before that hearing to prepare any initial defenses which may be available. Otherwise the right to representation by counsel may be a "formality [and a] grudging gesture to a ritualistic requirement." Kent v. United States, 383 U.S. 541, 561, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84 (1966). Counsel must also have access to all reports, psychiatric and otherwise, which will be

29. Although many mental inquiries are begun, as in the case of Miss Lessard, with detention, this is not necessarily the only procedure. A mental health proceeding may be commenced with a complaint by three adult residents of the state. Wis.Stat.Ann. § 51.01(1).

30. *See* part III A *supra*.

introduced at the hearing on commitment. *See* Kent v. United States, *supra,* 383 U.S. at 563, 86 S.Ct. 1045. The need for counsel at an early stage is also apparent from the provision for a jury trial on demand. Clearly, the subject of the civil commitment proceeding cannot competently decide whether to exercise that right without the aid of counsel. *See* Shioutakon v. District of Columbia, 98 U.S.App.D.C. 371, 236 F.2d 666, 669 (1956). The right to a jury trial has been shown to be critical, numerous studies indicating that the exercise of that right may well mean the difference between release and commitment. *See, e. g.,* Cohen, "The Function of the Attorney and the Commitment of the Mentally Ill," 44 Tex.L.Rev. 424, 447 (1966).[31]

 We are unable at this point, however, to be so certain that assistance of counsel will prove materially beneficial at the psychiatric interview as to be able to determine that the right to effective aid of counsel outweighs the interests of the state in meaningful consultation. Several courts have discussed this issue in the context of the mental examination required when an accused in a criminal trial raises the issue of insanity, noting that because of "the intimate and personal nature of the examination, . . . the presence of a third party, in a legal and non-medical capacity, would severely limit the efficacy of the examination . . . ." United States v. Albright, 388 F.2d 719, 726 (4th Cir. 1968); Thornton v. Corcoran, 132 U.S.App.D.C. 232, 407 F.2d 695, 701 (1969). It may be that a person charged with mental illness will be unable to properly exercise his rights of cross-examination without the presence of counsel at this critical stage in the pro-

ceeding. However, we think it appropriate to permit the state to demonstrate that other means, such as recording the interviews and making available to defense counsel the written results of the interview, will prove as effective in maintaining the individual's rights with less disruption to the traditional psychiatrist-patient relationship.

### D.
### The Privilege Against Self-Incrimination

Plaintiffs assert that the privilege against self-incrimination is applicable to civil commitment proceedings. As may readily be seen, application of the privilege involves conflicting considerations. On the one hand, statements made by a prospective mental patient may well be the basis for total involuntary loss of freedom, and thus it will not do to simply label these proceedings civil. In this respect at least the Supreme Court's opinion in In re Gault, 387 U.S. 1, 49, 50, 87 S.Ct. 1428, 1455, 1456, 18 L.Ed.2d 527 (1967), is directly applicable:

"It is true that the statement of the privilege in the Fifth Amendment, which is applicable to the States by reason of the Fourteenth Amendment, is that no person 'shall be compelled in any *criminal case* to be a witness against himself.' However, it is also clear that the availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites. The privilege may, for example, be claimed in a civil or administrative proceeding, if the statement is or may be inculpatory.

In 1947, an attempt was made to eliminate the jury trial in Wisconsin, after a legislative committee reported that juries too often refused to order commitment when medical experts thought it appropriate. Wis.Stat.1947, c. 51, general comment of interim committee, at 802.

---

31. *See* Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972): "The jury serves the critical function of introducing into the process a lay judgment, reflecting values generally held in the community, concerning the kinds of potential harm that justify the State in confining a person for compulsory treatment."

\* \* \* \* \* \*

. . . "[C]ommitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil.' And our Constitution guarantees that no person shall be 'compelled' to be a witness against himself when he is threatened with deprivation of his liberty—a command which this Court has broadly applied and generously implemented in accordance with the teaching of the history of the privilege and its great office in mankind's battle for freedom."

On the other hand, the prospect of a seriously ill individual being prevented from obtaining needed treatment, in a situation in which treatment is possible and will actually be given, on the basis of counsel's advice to refuse to make any statements to a psychiatrist appears ludicrous. As the majority stated in Tippett v. Maryland, 436 F.2d 1153, 1158 (4th Cir. 1971), cert. dismissed sub nom., Murel v. Baltimore City Criminal Court, 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972), "[i]t is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that." [32]

The conflicting interests are thus difficult to reconcile. The Supreme Court found it unnecessary to reach this question in McNeil v. Director, Patuxent Institution, 407 U.S. 245, 250, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972), but Justice Douglas in a concurring opinion found that the privilege was indeed applicable:

"Whatever the Patuxent procedures may be called—whether civil or criminal—the result under the Self-Incrimination Clause of the Fifth Amendment is the same. As we said in In re Gault, 387 U.S. 1, 49–50, 87 S.Ct. 1428, 18 L.Ed.2d 527, there is harm and self-incrimination whenever there is 'a deprivation of liberty;' and there is such a deprivation whatever the name of the institution, if a person is held against his will."

*Id.* at 257, 92 S.Ct. at 2091.

We find Justice Douglas' opinion and the underlying decision in *Gault* persuasive. Wisconsin may not, consistent with basic concepts of due process, commit individuals on the basis of their statements to psychiatrists in the absence of a showing that the statements were made with "knowledge" [33] that the individual was not obliged to speak. We do think, however, that the safeguards of the privilege may be obtained without the presence of counsel in the psychiatric interview. The patient should be told by counsel and the psychiatrist that he is going to be examined with regard to his mental condition, that the statements he may make may be the basis for commitment, and that he does not have to speak to the psychiatrist. Having been informed of this danger the patient may be examined if he willingly assents. It may be expected that most patients, like Miss Lessard in the present case, will desire to talk to a person they believe they can trust. Basic fairness requires, though, that they be given notice of the fact that their statements may indeed tend to incriminate them in the eyes of the psychiatrist and the trier of fact in a civil commitment proceeding.

This conclusion is fortified by medical evidence that indicates that patients re-

---

**32.** In a footnote to this statement the *Tippett* court stated that it did not regard this as a final determination of constitutionality and would not consider itself bound in a future case if experience indicated that the administration of the Act resulted in unfairness.

**33.** We use the term knowledge advisedly. The presumption in a civil commitment proceeding must be that the individual is indeed competent. If his rights are explained to him in simple terms it may be presumed that he has the requisite knowledge. If the individual in fact does not have this knowledge because of mental illness a subsequent finding of mental illness or mental incapacity on the basis of his statements cannot be said to violate due process. The state will still be obliged to prove that he is dangerous in order to sustain a recommendation of commitment.

spond more favorably to treatment when they feel they are being treated fairly and are treated as intelligent, aware, human beings. In Miss Lessard's case, for example, Dr. Kennedy testified that her improvement had occurred "following a period of involvement with not only hospital individuals and hospital staff influence, but an involvement with other environmental influences that have included a number of judicial involvements, legal involvements." (R. 51). Other experts have concurred in this analysis. *See, e. g.*, 1970 Hearings at 277 (testimony of Bruce J. Ennis); 1961 Hearings at 266–67 (testimony of Dr. Thomas Szasz).

■ Finally, cases in which the privilege has been denied with regard to mental examinations in criminal proceedings are inapplicable. *See, e. g.*, United States v. Albright, 388 F.2d 719 (4th Cir. 1968). For in those cases the defendant has raised the question of his mental capacity as a defense to acts done in violation of the criminal law. In civil commitment proceedings, however, there has been no allegation that a "defendant" has done anything in violation of any law which could justify the state's depriving him of liberty. The purpose of a criminal proceeding is to ascertain if a defendant has committed an act which will justify deprivation of his freedom. His defense of mental incapacity, if successful, will permit him to go free. The purpose of a civil commitment proceeding is to ascertain if a person's mental state justifies the state's taking away his liberty. The "evidence" obtained in a psychiatric interview goes to the heart of the government's case in the civil proceeding. In the criminal context, evidence obtained as to mental capacity goes only to a defense. In fact, any evidence obtained which relates to the real issue in the proceeding, the defendant's guilt of the crime charged, is excluded at the subsequent trial.

To conclude, statements made to a psychiatrist by the subject of a commitment proceeding, unless voluntarily given after notice of the possible consequences,

cannot be the basis for an order of commitment.

## E.
### Exclusion of Hearsay Evidence

Plaintiffs final challenge to the constitutionality of the Wisconsin civil commitment statute lies in the use of hearsay evidence at the commitment hearing. Defendants do not seriously dispute the validity of plaintiffs' contentions, stating that they "recognize fully well that hearsay wherever possible should be prevented in any type of legal proceeding." We agree.

The Supreme Court referred to the hearsay exclusionary rules in In re Gault, 387 U.S. 1, 11 n. 7, 87 S.Ct. 1428, 1435, 18 L.Ed.2d 527 (1967), quoting from Note, "Juvenile Delinquents: The Police, State Courts, and Individualized Justice," 79 Harv.L.Rev. 775, 794–795 (1966), as follows:

"The informality of juvenile court hearings frequently leads to the admission of hearsay and unsworn testimony. It is said that 'close adherence to the strict rules of evidence might prevent the court from obtaining important facts as to the child's character and condition which could only be to the child's detriment.' The assumption is that the judge will give normally inadmissible evidence only its proper weight. It is also declared in support of these evidentiary practices that the juvenile court is not a criminal court, that the importance of the hearsay rule has been overestimated, and that allowing an attorney to make 'technical objections' would disrupt the desired informality of the proceedings. But to the extent that the rules of evidence are not merely technical or historical, but like the hearsay rule have a sound basis in human experience, they should not be rejected in any judicial inquiry. Juvenile court judges in Los Angeles, Tucson, and Wisconsin Rapids, Wisconsin report that they are satisfied with the operation of their courts despite application of unrelaxed rules of evidence."

Although the issue of the admissibility of hearsay evidence was not before the Court, its decision in *Gault* and its reference to hearsay evidence leave little doubt as to how the Court would decide the issue in the juvenile setting.

We fail to see any distinction between the juvenile delinquency hearing and the civil commitment hearing in this regard. The weaknesses of hearsay evidence are the same, whatever the nature of the proceeding. Arguments concerning the necessity of excluding hearsay in trials generally have no relevance to the validity of admitting hearsay evidence in the civil commitment hearing. To the extent that exceptions to the hearsay rule permit the admission of hearsay into evidence, the same evidence may be admitted in a civil commitment hearing. Where standard exclusionary rules forbid the admission of evidence, no sound policy reasons exist for admitting such evidence in an involuntary mental commitment hearing. Indeed, as noted throughout this opinion, the seriousness of the deprivation of liberty and the consequences which follow an adjudication of mental illness make imperative strict adherence to the rules of evidence generally applicable to other proceedings in which an individual's liberty is in jeopardy. As Justice Brandeis noted in an often quoted statement: "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent . . . . The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." Olmstead v. United States, 277 U.S. 438, 479, 48 S.Ct. 564, 572–573, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

IV.

We conclude that the Wisconsin civil commitment procedure is constitutionally defective insofar as it fails to require effective and timely notice of the "charges" under which a person is sought to be detained; fails to require adequate notice of all rights, including the right to jury trial; permits detention longer than 48 hours without a hearing on probable cause; permits detention longer than two weeks without a full hearing on the necessity for commitment; permits commitment based upon a hearing in which the person charged with mental illness is not represented by adversary counsel, at which hearsay evidence is admitted, and in which psychiatric evidence is presented without the patient having been given the benefit of the privilege against self-incrimination; permits commitment without proof beyond a reasonable doubt that the patient is both "mentally ill" and dangerous; and fails to require those seeking commitment to consider less restrictive alternatives to commitment.

Alberta Lessard and the other members of her class are entitled to declaratory and injunctive relief against further enforcement of the present Wisconsin scheme against them. Inasmuch as Miss Lessard has been conditionally released, the only relief necessary in her case is a declaratory judgment that the order adjudging her mentally ill and in need of commitment was constitutionally defective. She is also entitled to an injunction against any further extensions of the invalid order which continues to make her subject to the jurisdiction of the hospital authorities.

The unnamed plaintiffs in this case, all persons 18 years of age or older who are being held involuntarily pursuant to any emergency, temporary or permanent commitment provision of the Wisconsin involuntary mental commitment statute, are also entitled to relief against further detention pursuant to the defective Wisconsin procedure. In order to ensure an orderly disposition of these cases, however, we believe that the Wisconsin authorities should be permitted a 90-day period in which to review their procedures with the purpose of conforming them to the procedure outlined in this opinion. During this period they will also have an opportunity to review the cases of each of the unnamed plaintiffs in this action. In some cases, the medical authorities may seek to change the patient status from involuntary to volun-

tary commitment. In other cases, the Wisconsin authorities may decide that release is necessary. Wisconsin should aid these patients in readjustment to society, enlisting the aid of state social agencies and perhaps commencing the release with day-time release programs or the utilization of half-way house facilities.

A number of patients are undoubtedly properly institutionalized, despite the defective procedures used in commitment. In those cases in which the Wisconsin medical authorities propose, in good faith, to seek renewed commitment orders, within the ninety-day period arrangements should be made for new hearings. These hearings must be in conformity with this opinion. Counsel must be appointed in time to prepare a defense and notice of all rights must be given the patient.

We shall request the defendants in this action to submit a memorandum to this court at the end of the ninety-day period detailing the procedures taken to dispose of the cases involved here and describing their efforts to implement this order in future cases.