# COURT OF APPEALS DECISION DATED AND FILED

## July 27, 2021

Sheila T. Reiff
Clerk of Court of Appeals

## NOTICE

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

---

**Appeal No.      2020AP1166**

**STATE OF WISCONSIN**

Cir. Ct. No.  2020ME3

## IN COURT OF APPEALS
## DISTRICT III

---

IN THE MATTER OF THE MENTAL COMMITMENT OF B. K.:

TREMPEALEAU COUNTY,

    PETITIONER-RESPONDENT,

  V.

B. K.,

    RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Trempealeau County: RIAN RADTKE, Judge. *Affirmed.*

¶1      SEIDL, J.[1]  Brian[2] appeals from an order of commitment and an order for involuntary medication and treatment, entered pursuant to WIS. STAT.

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

§ 51.20. Brian argues that his due process rights were violated because he was not given particularized notice as to which standard of dangerousness under § 51.20(1)(a)2. the County intended to pursue at his final commitment hearing. Brian also challenges the sufficiency of the evidence establishing that he was dangerous to himself or others under any of the standards set forth in § 51.20(1)(a)2. We affirm.

## BACKGROUND

¶2 In January 2020, law enforcement was dispatched for a welfare check on Brian, a thirty-two-year-old male with a history of schizophrenia. The officers found Brian walking down the street in seven-degree weather dressed in shorts, a cut-off t-shirt and a windbreaker jacket, but with no gloves or hat. Brian was carrying a mailbox with him, and the officers responding to the call noted that Brian was not able to answer their questions, but he would "talk about some very random things that did not make sense." Brian could not tell the officers the date or time, and an officer reported that during the course of their conversation, Brian would repeatedly "babble" about experiments that he was doing in his head. An officer called Northwest Connections—Brian's emergency mental health services provider—and an agent initially advised the officers that Brian was not a danger to himself and that they would contact his parents to establish a safety plan. About thirty minutes into their encounter, the officers noticed that Brian was shivering badly, and the officers recommended they all move inside to get warm. Brian

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials.

refused despite telling the officers at one point that his hands were so cold that he could not move them.

¶3      It took the officers an hour to persuade Brian to step inside, but once there, Brian repeatedly stated that he wanted to return outside.  The police again called Northwest Connections.  After learning of Brian's continued insistence to go back outside, the Northwest Connections agent advised the officers that Brian met the criteria for a WIS. STAT. ch. 51 commitment under the current circumstances, given the dangerously cold weather and Brian's inadequate clothing.  The officers took Brian into custody and delivered him to a hospital, and Brian was subsequently transferred to a different facility.

¶4      After a hearing, the circuit court found probable cause to believe that Brian was mentally ill, a proper subject for treatment, and dangerous to himself or others.  The court entered an order for Brian's involuntary medication and treatment for the period up to the final hearing, pursuant to WIS. STAT. § 51.61(1)(g)2.

¶5      A final commitment hearing was held on February 3, 2020.  During that hearing, psychologist Nicholas Starr testified regarding his examination of Brian.  He explained how the examination ended up being unsuccessful, in that it lasted less than five minutes because Brian refused to be examined, telling Starr that "the courts were fake, that [Starr] was fake, and [Starr] could not produce a stamp that had flakes going in opposite directions proving [Starr] was a doctor."

¶6      Starr testified that he talked to staff at the psychiatric hospital and reviewed the available records on Brian.  Based on those sources, Starr testified that during the encounter with law enforcement leading to Brian's commitment, Brian was "inappropriately dressed for the weather, was disorganized and

psychotic." At the hospital, Brian "continued to be psychotic, hypersexual, he continued to inappropriately disrobe himself, make inappropriate sexual comments towards staff, so he was difficult to control." Furthermore, "[t]here was some bizarre auditory hallucinations that he was riding a trike somehow and he would see multi-colored snakes that were after him." Starr testified the records revealed that Brian was not taking medication, which "resulted in him becoming unstable." Starr also testified that there were notations in the records that Brian had been "swinging knives at his mother."

¶7     Starr diagnosed Brian with schizoaffective disorder based on the symptoms that had been described by the authorities and were evident throughout Brian's case history, as well as from Starr's in-person observation of Brian. Although his examination of Brian was brief, Starr testified that Brian's behavior during their encounter supported his diagnosis. Additionally, Starr stated that Brian "continued to display the psychotic and bizarre behavior" during a later encounter he had with Starr by "making statements about killing a rabbit while spinning the wheel of an exercise bike at the hospital."

¶8     Starr recommended that Brian be stabilized with medication, and he testified that he believed Brian posed a danger to himself or others as a result of the incident leading to his emergency detention. Starr noted that Brian "would respond to his psychosis rather than reality. He may not be aware of how cold he is or how to get himself appropriately warm or seek help or support." Although Starr had discussed the advantages, disadvantages and alternatives to medication with Brian, he did not believe Brian was competent to refuse medications because of his "active psychotic state and his active manic state." Starr testified that Brian did not demonstrate any insight into his current mental illness.

¶9    The circuit court concluded that Brian was suffering from a mental illness, that he was a proper subject for treatment, and that his illness was treatable.  The court further concluded that grounds for commitment had been established based on the state in which Brian was found: improperly dressed in dangerously cold weather, confused, and carrying a mailbox.  The court also relied on the reports of Brian's hallucinations and hypersexuality, along with the remainder of Starr's testimony as to Brian's schizoaffective disorder.

¶10    The circuit court further determined that Brian was "dangerous as defined in Wisconsin Statutes under basic needs—not being able to meet his basic needs here, as well as harm to others as testified, as the doctor testified, which the [c]ourt finds credible and uncontroverted."  The court entered an order for involuntary commitment for a period of six months.

¶11    The circuit court also entered an involuntary medication order for a six-month period, concluding that Brian was not competent to refuse medication because he was substantially incapable of understanding his condition or the advantages, disadvantages and alternatives to medication.  Brian now appeals.

## DISCUSSION

¶12    The County argues that Brian's appeal is moot because the initial commitment order at issue has expired, such that invalidating it would have no "practical effect" on Brian's status, as Brian is now subject to a recommitment order with identical collateral consequences—i.e., a firearms ban.  We generally do not consider moot issues.  *State ex rel. Olson v. Litscher*, 2000 WI App 61, ¶3, 233 Wis. 2d 685, 608 N.W.2d 425.  An issue is moot when its resolution will have no practical effect on the underlying controversy.  *Id.*  We need not resolve this issue, however, because we conclude that even if Brian's appeal is not moot, there

is still sufficient evidence to support the circuit court's finding of dangerousness. An appellate court need not address every issue raised by the parties when one issue is dispositive. *Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508. Therefore, we assume without deciding that Brian's appeal is not moot and elect to address his arguments on their merits.

¶13 Turning to the merits, Brian argues that he was denied procedural due process because he was not given particularized notice of which standard of dangerousness the County intended to allege at the final commitment hearing. A procedural due process analysis involves a two-part inquiry, asking first "whether there exists a liberty or property interest which has been interfered with by the [County]" and, if so, "whether the procedures attendant upon that deprivation were constitutionally sufficient." *See State v. Stenklyft*, 2005 WI 71, ¶64, 281 Wis. 2d 484, 697 N.W.2d 769 (citation omitted). Due process determinations are questions of law that we decide de novo. *Waukesha Cnty. v. S.L.L.*, 2019 WI 66, ¶10, 387 Wis. 2d 333, 929 N.W.2d 140.

¶14 Brian argues that the dangerousness standard the County intended to pursue was consistently unclear. He cites *Lessard v. Schmidt*, 349 F. Supp. 1078 (E.D. Wis. 1972), *vacated and remanded on other grounds*, 414 U.S. 473 (1974), *reinstated*, 413 F. Supp. 1318 (E.D. Wis. 1976), for the proposition that Brian must be given notice of "the standard upon which he may be detained." He then asserts that in conjunction with WIS. STAT. § 51.20(1)(a)2.a.-e. and (am), this precedent mandates that he be notified of *which* of the dangerousness standards the County plans to pursue in the upcoming final hearing.

¶15 There is no requirement, however, that one or more of the five standards of dangerousness be explicitly alleged by the County prior to a final

6

hearing—a proposition Brian concedes. This is rational, given that the County would not receive reports from evaluating physicians—a primary focus of WIS. STAT. ch. 51 commitments—until shortly before the final hearing. Procedural due process does not require the County to provide notice of every trial strategy or specific approach it might plan to take, especially when the evidence necessary to evaluate dangerousness is forthcoming, and when indicating the general dangerousness standards is sufficient. *See Milwaukee Cnty. v. T.L.R.*, 2019 WI App 5, ¶15, 385 Wis. 2d 515, 925 N.W.2d 790 (2018) (holding that no statutory requirement exists that the County must specify which of the dangerousness standards is to be alleged at a final commitment hearing, and that a list of potential dangerousness standards is constitutionally sufficient).

¶16     Brian cites *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277, which was decided after the hearing at issue in this case, for the proposition that particularized notice must be given to ensure due process. *D.J.W.* established the requirement that a circuit court must make its factual findings as to dangerousness with particularity to ensure that there is sufficient evidence to support a dangerousness finding, and to provide a clear record for appellate review. *Id.*, ¶¶42-45. *DJ.W.* does not, however, mandate that an individual subject to a final commitment hearing be given notice in advance of the exact standards of dangerousness the County intends to prove. Both the notice of final hearing and the statement of emergency detention in Brian's case cited or listed the standards of dangerousness under WIS. STAT. § 51.20(1)(a)2.a.-e. Therefore, Brian had sufficient notice of the standards under which he was to be evaluated, and his right to procedural due process was not violated.

¶17     Brian next argues that there was insufficient evidence to establish dangerousness under any of the standards set forth in WIS. STAT. § 51.20(1)(a)2.

In a WIS. STAT. ch. 51 proceeding, a petitioner has the burden to prove by clear and convincing evidence that a subject individual is mentally ill, a proper subject for treatment, and dangerous. *See* § 51.20(1)(a), (13)(e). Whether this burden has been met presents a mixed question of fact and law. *Waukesha Cnty. v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. We uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* Whether these findings satisfy the statutory standards is a question of law that we review de novo.[3] *Id.*

¶18 Brian argues that Starr was not specific during the final hearing as to which standard of dangerousness he believed applied, stating only that Brian posed a danger to himself or others because he was inappropriately clothed. Starr's testimony, however, sufficiently outlined that Brian's hallucinations, schizoaffective disorder and recent behavior placed him at a serious risk of endangering himself, particularly in another cold-weather incident. Although Brian argues Starr's testimony that Brian might "not be aware of how cold he is or how to get himself appropriately warm" was speculative, Starr's analysis directly stemmed from the incident that endangered Brian's safety, and it was not merely

---

[3] The final circuit court decision in this case was issued in December 2018. Our supreme court has since implemented a requirement in *Langlade County v. D.J.W.*, 2020 WI 41, ¶3, 391 Wis. 2d 231, 942 N.W.2d 277, that "going forward circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based." While *D.J.W.* addressed a recommitment petition and not, as here, an initial commitment, we assume the court's ruling regarding the specific reference to a statutory dangerousness standard equally applies to initial commitments. *D.J.W.*, 391 Wis. 2d 231, ¶¶42-44; *see also Winnebago Cnty. v. A.A.L.*, No. 2020AP1511, unpublished slip op. ¶17 n.8 (WI App Mar. 24, 2021).

Because the circuit court was not yet subject to this requirement when it made its factual findings, we will search the record and the court's decision for specific facts that apply to the dangerousness determination at issue. *See Winnebago Cnty. v. S.H.*, 2020 WI App 46, ¶¶14-15, 393 Wis. 2d 511, 947 N.W.2d 761.

an assumption or prediction that Brian might be a danger to himself. The circuit court also added specificity, finding Brian to be dangerous because he could not "meet his basic needs," referencing the language in WIS. STAT. § 51.20(1)(a)2.d.

¶19 Brian contends, however, that the County failed to establish dangerousness under WIS. STAT. § 51.20(1)(a)2.d., which provides that an individual is dangerous if he or she:

> Evidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue unless the individual receives prompt and adequate treatment for this mental illness.

Brian argues that many people choose to wear shorts in the winter, and that the government should not be able to dictate what kinds of clothing are appropriate to wear outside in cold temperatures. Brian further argues that although the failure to dress warmly might be a safety issue, it is a "huge leap" to claim that it warrants commitment.

¶20 Brian's arguments are unavailing. Brian was found in freezing cold weather carrying a mailbox and wearing shorts, a cut-off t-shirt and a windbreaker jacket, with no gloves or hat. Despite consistently commenting that he was "too cold to feel his arms," and his making little sense to the responding officers, Brian refused for over an hour to move his conversation with police inside. Once there, Brian continued to insist on returning to the dangerously cold weather outdoors. This incident alone is sufficient to establish dangerousness under WIS. STAT. § 51.20(1)(a)2.d., as it shows that Brian was unable to satisfy his basic needs for

9

shelter and safety, such that there was a substantial probability that his death or serious debilitation would ensue absent treatment.

¶21    Beyond the incident leading to his commitment, Brian's reported behavior after being committed—including reports that at the hospital he was delusional, confused, and manic—confirm that the behaviors exhibited by Brian that put him at risk during the initial incident have continued.  Starr's testimony supports the conclusion that these behaviors and Brian's schizoaffective disorder continue to place Brian at risk in such a manner that he is unable to satisfy basic needs for his own safety, particularly when outdoors in cold weather.  The facts and record therefore show that Brian was dangerous under WIS. STAT. § 51.20(1)(a)2.d.  Although Brian raises arguments relating to other standards under § 51.20(1)(a)2., we need not address them because we conclude the County met its burden of proving dangerousness under subd. para. 2.d.  We therefore affirm the involuntary commitment order and the order for involuntary medication and treatment.

*By the Court.*—Orders affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.