COURT OF APPEALS
DECISION
DATED AND FILED

January 11, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP603**

Cir. Ct. No. **2021ME171**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

IN THE MATTER OF THE MENTAL COMMITMENT OF L.A.T.:

KENOSHA COUNTY,

PETITIONER-RESPONDENT,

V.

L.A.T.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Kenosha County: JODI L. MEIER, Judge. *Affirmed.*

¶1     LAZAR, J.[1]  L.A.T.[2] appeals from orders of the trial court, entered pursuant to WIS. STAT. § 51.20, for her civil commitment and for involuntary medication and treatment.  L.A.T. asserts that the trial court failed to conduct an adequate colloquy before accepting her stipulation to the commitment and involuntary medication orders, that such a colloquy should be mandatory in all civil commitment cases, and that her stipulation was not knowing, intelligent, and voluntary.  She further asserts that the evidence presented at trial was insufficient to prove that she was dangerous and that the trial court's findings were insufficient to establish the specific dangerousness she asserts is required by *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277.

¶2     This court concludes that colloquies between the trial court and those individuals who stipulate to civil commitment and/or involuntary medication orders are not mandatory in every case, that there was an adequate colloquy with L.A.T., and that L.A.T.'s stipulation was knowing, intelligent, and voluntary.  This court further concludes that, due to the stipulation, sufficient evidence was presented to establish L.A.T.'s dangerousness.  Finally, this court concludes that, while the requirement for specificity with respect to dangerousness pronounced in *D.J.W.* is applicable to initial commitments and not just to recommitments, there is no merit to L.A.T.'s final argument because L.A.T. knowingly entered into a

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted. L.A.T. filed a motion for a three-judge panel on April 13, 2022, asserting that the question of protocol for stipulations in commitment cases warranted a published decision.  This court disagrees.  Accordingly, the motion is hereby denied.

[2] This court refers to Appellant by her initials to protect her confidentiality.  Despite filing a motion for a three-judge panel, L.A.T. did not file a reply brief in this appeal, leaving this court without the benefit of additional argument.

stipulation as to all three elements (including dangerousness) required for commitment.

¶3      On October 10, 2021, L.A.T.—then in her early fifties—moved back to her parents' residence in Wisconsin from Colorado, where she had been living since early 2020. Her return was a surprise to her parents. They had financially supported L.A.T. while she was in Colorado, and they knew that the lease for the apartment she had been living in (cosigned by her father) had expired, but L.A.T. had exhibited "[e]xtreme anger" with her father in phone calls from Colorado. This anger had escalated to "harassment second to none," and L.A.T.'s parents had not had recent contact with her. L.A.T. was calm her first day home, but by the second day she appeared stressed, so her parents began locking their bedroom door on the third day. Her parents called crisis intervention because they felt L.A.T. was stressed, angry, and disorganized in her thoughts and speech.

¶4      Three days after her return, on October 13, L.A.T. had an argument with her parents and began following her father around the home as she tore up the crisis intervention paperwork. L.A.T. threw a roll of tape at her father, and when her parents fled the house, L.A.T. locked them out. L.A.T.'s parents again called a crisis intervention worker who then called the police. L.A.T. was agitated and uncooperative; ultimately, the police handcuffed her and brought her to an emergency room for medical evaluation and emergency involuntary civil commitment under WIS. STAT. § 51.15.

¶5      After probable cause to continue the case was found, L.A.T. requested a jury trial on her commitment, which took place on November 3, 2021. L.A.T.'s father testified regarding the October 13 incident, explaining that although L.A.T. had had issues with mental health in the past, he had never seen

her so angry or violent before. He feared for his safety due to L.A.T.'s unpredictability, so he decided to quickly leave the house when L.A.T. started to walk to where he stood after she had thrown the tape at him. He further testified that L.A.T. pushed her mother (his wife) out of the house and pushed on the door when her mother's foot got caught in the doors.

¶6 Next, the state-appointed psychiatrist who had evaluated L.A.T., Dr. Sangita Patel, testified that L.A.T. suffered from mental illness (either bipolar disorder or schizophrenia); that she believed L.A.T. was treatable, based in part on the fact that L.A.T. had responded well to treatment in the past; and that L.A.T. "pose[d] a substantial risk of harm towards other people." Patel based these opinions upon L.A.T.'s aggression toward the community, the hospital nurse, and the staff at the psychiatric facility in which she had been placed for the several weeks since she was committed. Finally (outside the presence of the jury[3]), the psychiatrist gave her opinion that psychotropic medications would have a therapeutic value for L.A.T. Patel's "Report of Examination," previously filed on October 22, 2021, was admitted as an exhibit in the trial.

¶7 After a lunch break in the trial, counsel for the County and for L.A.T. informed the trial court that L.A.T. was willing to stipulate to the commitment and involuntary medication orders. The trial court asked L.A.T. whether she heard what her attorney said, and she answered that she did. L.A.T. then said that she would like to see the stipulation "on paper," specifically what "[t]he medication is." The court explained that the "stipulation is agreeing to the

---

[3] The issue of involuntary medication is not within the jury's province, but rather is determined by the trial court alone. WIS. STAT. § 51.20(7)(d).

… request" which was "the six-month commitment and … the medication order." The court further stated that it could not determine "what medication" because that is a question for the medical doctors, and that the involuntary medication order would provide that L.A.T. "could be administered medication without [her] consent."

¶8    At this point, L.A.T. conferred with her counsel off the record. She then confirmed to the trial court that she had sufficient time to consult with her attorney and that she had had her questions answered. L.A.T. replied, "I think. Yes." to the court's question of whether she was agreeing to the six-month commitment with the involuntary medication order "that could be used if needed." Her attorney confirmed that answer.

¶9    The trial court stated, on the record, that it found the grounds for commitment had been established as follows:

> I did hear testimony from Dr. Patel and we all did this morning and based on her testimony I do find that grounds for the commitment have been established. Dr. Patel testified that [L.A.T.] does have a mental illness and that her behavior does meet one or more of the standards ... of the statutes.
>
> Dr. Patel further testified that [L.A.T.] is a proper subject for treatment and that her condition is likely to be controlled with appropriate medication. That evidence presented by Dr. Patel who is qualified to make those determinations.
>
> I do find first of all Dr. Patel to be credible in her testimony and I find the evidence to be clear and convincing of that and the parties are stipulating so I will order that [L.A.T.] be committed for six months from today's date ….
>
> The maximum level of treatment shall be a locked inpatient facility of such as Winnebago or like facility until she's discharged by the doctors.

¶10    The trial court also found, based upon Patel's testimony at trial and the stipulation by the parties, that medication and treatment would have therapeutic value.  The court further found that Patel explained the advantages, disadvantages, and alternatives to medication to L.A.T., but due to L.A.T.'s mental illness, there is a "lack of competency to refuse psychotropic medication or treatment because of the substantial incapability of applying an understanding of the advantages, disadvantages and alternatives to her condition in order to make an informed choice whether to accept or refuse psychotropic medication."  Based upon that, the court ordered medication and treatment to be administered to L.A.T. regardless of her consent.

¶11    The trial court signed an order for involuntary medication and treatment on the day of the trial (November 3, 2021) and an order of commitment[4] the next day.  L.A.T. appeals both orders.

## DISCUSSION

¶12    To issue a civil commitment order, a trial court must find that a petitioner established by clear and convincing evidence that the subject individual is mentally ill, a proper subject for treatment, and dangerous to him/herself or others under at least one of the five statutory standards.  ***D.J.W.***, 391 Wis. 2d 231, ¶29; WIS. STAT. § 51.20(1)(a)1.-2., (13)(e).  This is especially critical because "[i]t may be true that an erroneous commitment is sometimes as undesirable as an

---

[4] The trial court utilized order form "ME-911, 03/20 Order of Commitment/Extension of Commitment/Dismissal" that does not specify the statutory paragraph under which the court finds dangerousness or how that dangerousness has manifested in the subject individual.  That form has since been revised (as of March, 2022) to specify statutory dangerousness by paragraph.  All trial courts should now use the new form.

erroneous conviction." ***Addington v. Texas***, 441 U.S. 418, 428 (1979). So, courts are to take special care in this area of law.

¶13 The review of a civil commitment order—determining whether the petitioner has met the burden of proof—presents a mixed question of law and fact. ***Waukesha County v. J.W.J.***, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. A trial court's findings of fact are upheld unless they are clearly erroneous, ***id.***, and an appellate court will "accept reasonable inferences from the facts." ***Winnebago County v. Christopher S.***, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). Whether those facts satisfy the statutory standards, however, is a question of law that is reviewed de novo. ***Marathon County v. D.K.***, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901.

### I. Colloquies with the court are not required for every stipulation.

¶14 Both parties agree that there is an unpublished[5] appellate decision directly on point, holding that trial courts are not required to conduct colloquies with people subject to WIS. STAT. ch. 51 proceedings to establish that they are knowingly, intelligently, and voluntarily accepting a stipulation to the extension of an involuntary civil commitment. *See **Dane County v. N.W.***, No. 2019AP48, unpublished slip op. (WI App Aug. 29, 2019), *review denied* (WI Dec. 10, 2019) (No. 2019AP48). The court in ***N.W.*** held that the statutorily mandated colloquies in criminal pleas and proceedings for termination of parental rights cases are not required in Chapter 51 cases. ***Id***., ¶8.

---

[5] Unpublished authored cases may not be cited for precedential value but may be cited for persuasive value. *See* WIS. STAT. RULE 809.23(3)(a), (b).

¶15    L.A.T. argues against that decision, implicitly seeking its reversal at some point even though our supreme court denied a petition for review in *N.W.* L.A.T. also asserts that the statutory presumption articulated in WIS. STAT. § 51.59(1), that subject individuals are not to be deemed incompetent to manage their affairs solely due to a civil commitment, has been or should always be rebutted in cases like hers.  Both of these arguments are without merit.

¶16    In a case involving waiver of the right to counsel—which can be analogized to waiver of trial and acceptance of a civil commitment stipulation— our supreme court discussed the requisite competence to make such a choice, noting that "[t]here undoubtedly is a logical tension between a finding of competence to make that decision and the ultimate finding of the very proceeding in which the defendant goes it alone when the final decision of the jury is mental illness."  *S.Y. v. Eau Claire County*, 162 Wis. 2d 320, 333, 469 N.W.2d 836 (1991).  But that court aptly relied upon the clear statutory presumption under WIS. STAT. § 51.19(1).  *S.Y.*, 162 Wis. 2d at 334; *see also Lessard v. Schmidt*, 349 F. Supp. 1078, 1101 n.33 (E.D. Wis. 1972), vacated on other grounds, 414 U.S. 473 (1974) ("The presumption in a civil commitment proceeding must be that the individual is indeed competent.").

¶17    Not only is the lack of a mandatory colloquy in WIS. STAT. ch. 51 cases supported by case law, but it is also supported by practice and reality.  Many persons in need speak with their counsel before a recommitment (or even initial commitment) and waive their rights to contest the petition, waive their right to appear in person (or by zoom or telephone), and stipulate to the entry of both orders for commitment/recommitment and for involuntary medication.  That information is relayed to the trial court by letter and then affirmed on the record by counsel.  This is done for many reasons, not the least of which is that some

individuals find appearances in court to be traumatic or too stressful or they agree that the supervision of the county and the administration of medications has been helpful in allowing them to remain in the community, a group home, or even inpatient placement.

¶18    That being the case, it would be harmful to these individuals to require them to appear in court to undergo a colloquy before the trial court could accept their stipulation.  This bolsters a conclusion that there should not be a bright-line mandatory colloquy rule in civil commitments.  Moreover, when the individual is present in court and the trial court has the ability to conduct such a colloquy, some flexibility has to be permitted.  People subject to civil commitment proceedings run the gamut from being able to verbally express themselves clearly to having disabilities that impair their speech; but they may still be able to express their choices.  In addition, there may often be nervousness and possible agitation that could lead to the "logical tension" discussed in *S.Y.  S.Y.*, 162 Wis. 2d at 333.  Even so, that presumption of competence exists, and there is no basis in law or in practice to require colloquies in all civil commitment cases.  Since there was a colloquy with L.A.T., it can be reviewed by this court.

## II.    The colloquy with L.A.T. was sufficient.

¶19    L.A.T.'s counsel asserts that the transcripts show she was confused about the stipulation and could not have knowingly and intelligently entered that agreement.  First, L.A.T. complains that the trial court was a bit flippant and engaged in inappropriate joking banter.  It is true that there was some casual byplay, but it was not excessive, and it showed that the trial court was treating

L.A.T. with the same kind and friendly demeanor[6] it showed in its interactions with the jurors.  More important, there was a lengthy colloquy with L.A.T., to wit:

> [County's Attorney]:  It's my understanding over the lunch hour that [L.A.T.] may be willing to stipulate to the commitment and medication order.
>
> ....
>
> [L.A.T.'s Attorney]:  That is my understanding at this moment, Your Honor.
>
> THE COURT:  [L.A.T.], did you hear what your attorney has stated?
>
> [L.A.T.]:  I did.
>
> THE COURT:  Is that the case?
>
> [L.A.T.]:  I would—yes, it is.  I would like to see it on paper what the stipulation is.  The medication is.

¶20     It was at this point that L.A.T. and the trial court were talking a bit at cross purposes.  L.A.T. wanted to see the proposed orders (something that the trial court could have done by printing out the form orders), and she wanted to know which medication could/would be administered to her without her consent (something the trial court would *not* have known).  The proposed orders—in fact, the signed orders—do not venture into the medical professionals' domain and mention any medication by name; the involuntary medication order just states that medication and treatment, including psychotropic medications, "may be administered to [L.A.T.], regardless of … her consent … during the period of commitment, or until further order of the court."

---

[6] The trial court also expressed concern about whether L.A.T. had been given some of the pizza and water brought for the jury.

¶21 After the trial court explained that the choice of medication was up to the treating doctors, L.A.T.'s counsel asked to speak with her off the record. Following that discussion, the trial court continued its colloquy with L.A.T.:

> THE COURT: Attorney Rolf, did you have an opportunity—
>
> [L.A.T.'s Attorney]: Yes.
>
> THE COURT: —to have whatever discussion you wanted with [L.A.T.]?
>
> [L.A.T.'s Attorney]: I did, Your Honor. Yes.
>
> THE COURT: [L.A.T.], did you have enough time to get whatever questions you had answered by Attorney Rolf?
>
> [L.A.T.]: I did.
>
> THE COURT: Okay. And based on that discussion what is the position of [L.A.T.], Attorney Rolf? Or—or [L.A.T.]? Are you agreeing to the six-month commitment with the involuntary medication order if it's need—if that could be used if needed?
>
> [L.A.T.]: I think. Yes.
>
> [L.A.T.'s Attorney]: She says yes, Your Honor.
>
> THE COURT: Okay. All right.

¶22 Taken together, it is evident that the trial court conducted a thorough and sufficient colloquy with L.A.T. about the stipulation. L.A.T. has failed to rebut the statutory presumption that she was competent to consider the options available to her, to review and analyze how the trial had gone that morning, and whether she could stipulate to the two orders (for commitment and involuntary administration of medication). It was her burden to overcome that presumption because the County had established the basic facts. *State v. Kummer*, 100 Wis. 2d 220, 228, 301 N.W.2d 240 (1981) ("'[E]xcept as otherwise provided by statute' a presumption is a procedural device which 'imposes on the party relying on the

presumption the burden of proving the basic facts, but once the basic facts are found to exist the presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence.'" (quoting WIS. STAT. RULE 903.01 (1977))).

¶23    Accordingly, this court upholds the trial court's determination that the stipulation was knowingly, intelligently, and voluntarily made by L.A.T. Nevertheless, the remaining issues relating to the trial court's dangerousness finding must be addressed.

### III.    There was sufficient evidence to support a finding of dangerousness.

¶24    By stipulation, L.A.T. conceded that there was sufficient evidence to support a dangerousness finding. The analysis could end at that point. But even disregarding L.A.T.'s valid stipulation, the County met its burden of proof on the issue of dangerousness with testimony from Dr. Patel and L.A.T.'s father.

¶25    Patel testified at the jury trial and her examination report was admitted into evidence. In her opinion, to a reasonable degree of medical certainty, L.A.T. was mentally ill and suffered from "[s]chizophrenia versus bipolar affective disorder—manic and psychotic." She further testified that this mental illness "substantially impact[s] ... or [a]ffect[s] [L.A.T.]'s judgment, behavior and capacity to recognize reality." Patel further opined at trial that "[L.A.T.]'s not able to separate her delusions from reality that are impairing her judgment. Because of this paranoia she's immensely angry at her parents …."

¶26    When asked whether, in her professional opinion, Patel believed that L.A.T. "pose[d] a substantial probability of serious physical harm to herself or others at this point," Patel responded that, "in [her] opinion, [L.A.T.] does pose a

substantial risk of harm towards other people." When asked to elaborate, Patel explained:

> Based on behaviors across the board. At home. In the community. In like in the emergency room she was aggressive towards the nurse who was trying to do the assessment on her. She was taken there for medical clearance. The aggression she's manifesting at Winnebago Mental Health Institute. Again, that is clearly above the underlying paranoia.
>
> … So she has aggressed towards the staff on the unit. She has thrown registry through the trap when she was put in the seclusion through the trap door.
>
> … She has been because of her behave—these behaviors she has—she needed to be put in secured quaran—a locked room for multiple times through her hospital stay.
>
> Such aggression when acted towards the elderly people like with her parents that can—that—that can lead to—that will have a potential consequence. Could even be life-threatening consequence. There are elderly people, young staff in the hospital can move away from the targeted aggression, but elderly won't be—won't be able to do that or protect themselves.

¶27 In Patel's examination report, she opined that L.A.T. was dangerous under WIS. STAT. § 51.20(1)(a)2.b. ("[A] substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm."). That report provided additional relevant information on dangerousness:

> [L.A.T.]'s aggressive behaviors are a product of underlying paranoia, lack of insight and inability to understand or follow directions or trust people. She is particularly paranoid about her parents and has displayed physical aggression towards them. Her erratic thoughts inhibit her ability to look at the situations in realistic fashion and

problem solve instead she has been lashing out in aggressive fashion.

¶28 Patel wrote about how the initial stay with L.A.T.'s parents began cordially, but that L.A.T.'s "behaviors apparently continued to escalate," and her parents reported being "fearful" of L.A.T., but couldn't provide specific examples until a few days later when they were locked out of their home:

> [L.A.T.] apparently had become physically aggressive and threw masking packing tape at her dad and had physically pushed the mother. Elderly mother particularly was very fearful of [L.A.T.] and was tearful at times when she was talking to the crisis worker. Crisis worker further notes that when she was trying to talk to [L.A.T.], she was becoming aggressive and "approached the work[er] in a threatening manner." [L.A.T.] was then taken into custody by PPPD Patty and Kelly for domestic violence and disorderly conduct.

¶29 During the morning of her jury trial, L.A.T.'s father also testified as to her conduct and his concerns over her aggressive behavior. Most telling was his simple statement that he "saw a level of anger in [his] daughter that [he] had never seen starting to develop" on her third day home. He was concerned things were "not gonna go well." On the day in question, L.A.T. began to taunt her parents, and she "got extremely, extremely angry." L.A.T.'s father said he had "never seen her that angry and violent [his] whole life." He refused to allow her to drive his car out of fear she could harm herself or others on the road. After L.A.T. threw the roll of tape at him, her father believed that she was extremely violent, he was in fear for himself, and he didn't know what L.A.T. was capable of doing to him and his wife because she was so unpredictable. All he knew was that he and his wife had to leave their home immediately. He saw his wife pushed out the door by L.A.T. Even though they could have re-entered the home through a side door, they remained in the garage to avoid any violence against them.

¶30     Finally, after hearing the testimony from the morning of her jury trial, L.A.T. determined that she no longer wanted to contest the civil commitment and medication orders and instead agreed to stipulate to both.

¶31     The trial court made no findings as to L.A.T.'s dangerousness with respect to a particular statutory paragraph but did find that "grounds for the commitment have been established." Based upon the stipulation, it was not necessary to elaborate. The court then stated that "Dr. Patel testified that [L.A.T.] does have a mental illness and that her behavior does meet one or more of the standards … of the statutes." It appears that the court was referring to WIS. STAT. § 51.20(1)(a)2.b., the provision dealing with harm to others. Patel did opine, in her report of examination, that L.A.T. was dangerous under this statutory provision. She also testified that she believed L.A.T.'s judgment was impaired, providing a possible basis for a finding of dangerousness under WIS. STAT. § 51.20(1)(a)2.c.[7]

¶32     L.A.T. contends that her conduct did not rise to the level of "dangerous" under any of the statutory provisions. She contends that her conduct is akin to that in two unpublished decisions where dangerousness was not found by the trial courts: *Milwaukee County v. Cheri V.*, No. 2012AP1737, unpublished slip op. (WI App Dec. 18, 2012), and *Chippewa County v. M.M.*, No. 2017AP1325, unpublished slip op. (WI App May 1, 2018). L.A.T.'s arguments fall flat because of her stipulation. Regardless, a review of both of these cases establishes that they are distinguishable based on the facts that were revealed during L.A.T.'s trial.

---

[7] WIS. STAT. § 51.20(1)(a)2.c provides that an individual is dangerous if the individual "[e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals."

¶33 In *Cheri V.*, the subject of a potential commitment order had been agitated, yelling, and pointing a finger at another patient—but there was no evidence of threats or intent to harm others. *Cheri V.*, No. 2012AP1737, ¶7. That court held that none of the statutory prerequisites were met because "yelling at and pointing a finger at another person, irrespective of how dangerous that other person might be" is not sufficient evidence of dangerousness. *Id.* Here, L.A.T. did more than just yell and point. She threw an item, broke other items in the home, and pushed her mother out the door. She approached her parents aggressively in a manner that frightened them and caused them to rapidly leave their home. She acted aggressively toward the hospital nurse trying to provide a medical clearance. She acted so aggressively at Winnebago Mental Health Institute that she was quarantined away from other patients. These behaviors are more serious—more dangerous—than that single act identified in *Cheri V.*

¶34 In *M.M.*, there was loud speech ("very, very, very loud" speech) and "aggressive, verbal behavior," and M.M., the person subject to a potential commitment order, stood very close to a psychologist, invading his personal space. *M.M.*, No. 2017AP1325, ¶4. However, that psychologist testified that he did not feel intimidated, nor did he ever feel in danger to the point that he needed to stop his interview. *Id.* Here, L.A.T.'s aggression had escalated to throwing an item and closing in on her parents so threateningly that they felt they had no choice but to leave their home to preserve their safety. L.A.T.'s father also refused to allow L.A.T. to drive his car out of fear for her and the community's safety. *See R.J. v. Winnebago County*, 146 Wis. 2d 516, 522, 431 N.W.2d 708 (Ct. App. 1988) (concluding that fear for safety of others—who are not aware of a threat to themselves—is a valid fear to be considered in civil commitment cases). L.A.T.'s conduct at Winnebago Mental Health Institute caused her to be isolated due to the staff's concerns for other patients' (and staff's) safety.

¶35 Given the valid stipulation and all of these facts, this court concludes that the County met its burden to establish, by clear and convincing evidence, that L.A.T. was statutorily dangerous as manifested by recent conduct to warrant civil commitment. There remains one further step that this court must consider: whether the type of dangerousness must be specifically identified by the trial court.

### IV. L.A.T.'s stipulation satisfies the statutory requirement on dangerousness.

¶36 There is no dispute that the trial court did not state which statutory paragraph described L.A.T.'s dangerousness, either in its oral ruling or written order. Patel's examination report found dangerousness under WIS. STAT. § 51.20(1)(a)2.b., and she opined in her testimony, discussed above, that L.A.T. was dangerous to her parents, the hospital nurse, the institute's staff, and the public and community.

¶37 L.A.T. contends that a trial court must pinpoint or identify the specific paragraph of WIS. STAT. § 51.20(1)a.2. that describes the dangerousness of an individual before it can issue a commitment order, as required in *D.J.W.*, 391 Wis. 2d 231, ¶3. The County disagrees, noting that *D.J.W.* was a recommitment rather than an initial commitment proceeding like this one. This court concludes that the *D.J.W.* requirement for "specific factual findings with reference to the subdivision paragraph" of the statute, *id.*, also applies to initial commitments. It further concludes, though, that L.A.T.'s stipulation satisfies the specificity requirements.

¶38 The two reasons set forth in *D.J.W.* in the context of recommitments justify an extension of this mandate to all civil commitment cases. "First, it provides clarity and extra protection to patients regarding the underlying basis for

17

a recommitment." *Id.*, ¶42. Civil commitments are significant curtailments of an individual's personal liberty and they can carry with them an additional deprivation of personal autonomy when accompanied by an involuntary medication and treatment order. "[C]ivil commitment cases are to be handled with the utmost diligence and care." *D.K.*, 390 Wis. 2d 50, ¶26. Second, as the *D.J.W.* court elaborated:

> [A] requirement of specific factual findings ... will clarify issues raised on appeal of recommitment orders and ensure the soundness of judicial decision making specifically with regard to challenges based on the sufficiency of the evidence. *See Klinger v. Oneida County*, 149 Wis. 2d 838, 846-47, 440 N.W.2d 348 (1989) ("[A]s this court has stated many times, the circuit court must make a record of its reasoning to ensure the soundness of its own decision making and to facilitate judicial review."). A more substantial record will better equip appellate courts to do their job, further ensuring meaningful appellate review of the evidence presented in recommitment proceedings.

*D.J.W.*, 391 Wis. 2d 231, ¶44.

¶39 Several unpublished appellate opinions have also extended the *D.J.W.* requirement to all civil commitment cases for the two-fold reasons of providing clarity and protecting individuals from guesswork and providing appellate courts with a better ability to ensure the soundness of circuit court judicial decision-making. *See Milwaukee County v. A.J.G.*, No. 2021AP1338, unpublished slip op. ¶13 (WI App May 3, 2022) ("[W]e are not persuaded that an individual in an original commitment is entitled to any less protection or clarity than an individual in a recommitment proceeding."); *Outagamie County v. D.G.M.*, No. 2020AP967, unpublished slip op. ¶18 n.5 (Sept. 21, 2021) ("While *D.J.W.* addressed a recommitment petition and not, as here, an initial commitment, we assume the court's ruling regarding the specific reference to a statutory dangerousness standard equally applies to initial commitments.");

*Shawano County v. S.L.V.*, No. 2021AP223, unpublished slip op. ¶16 (Aug. 17, 2021); *Outagamie County Dep't of Health & Hum. Servs. v. M.D.H.*, No. 2020AP86, unpublished slip op. ¶7 n.4 (July 13, 2021); *Trempealeau County v. B.K.*, No. 2020AP1166, unpublished slip op. ¶17 n.3. (July 27, 2021); *Winnebago County v. A.A.L.*, No. 2020AP1511, unpublished slip op. ¶17 n.8 (Mar. 24, 2021) ("We recognize that [*D.J.W.*] specifically dealt with recommitment proceedings, but we see no reason why the court's mandate would not apply for initial commitments as well. The 'purpose of making specific factual findings' is equally applicable to initial commitments." (citation omitted)). These courts found no basis to distinguish between original commitments and recommitments.

¶40 This court agrees that individuals in civil commitment cases, be they initial or recommitment, are vulnerable individuals whose rights to liberty must be carefully protected. It matters not whether they are facing their first commitment or a second (or tenth) extension: they deserve heightened care to ensure that their rights to personal freedom and to be free from involuntary medication and treatment, should the circumstances so warrant, are not inappropriately violated. They deserve equal clarity and protection. A trial court's specification of which type of statutory dangerousness has been found provides the added benefit that appellate courts will be able to more accurately assess the soundness of the trial court's judicial decision-making. Accordingly, that extra *D.J.W.* protection is equally applicable for an initial commitment.

¶41 In this case, the trial court made no oral findings regarding L.A.T.'s dangerousness as it relates to a specific statutory provision. In the typical case, this would necessitate a reversal and, if the time for the commitment or recommitment had expired, no remand because the trial court would have lost competency. *See Sheboygan County v. M.W.*, 2022 WI 40, ¶¶34-35, 402 Wis. 2d

1, 974 N.W.2d 733.  In this case, however, L.A.T. entered into a stipulation as to all three elements, including dangerousness.  While it would have been best for the trial court to state which statutory paragraph applied, the stipulation satisfactorily covered that base.  An individual who enters a stipulation and stops the entry of further evidence at trial cannot be allowed to later eviscerate the stipulation by arguing a lack of specificity of a dangerousness finding.  The County relied upon the stipulation and did not call the rest of its witnesses.  The trial court conducted an appropriate colloquy and determined that L.A.T. conceded that she was subject to a treatable mental illness and that she was dangerous under one or more statutory provisions.  That is sufficient.  Absent the stipulation, the trial court would have had to make a better record.  Given the stipulation, the orders are affirmed.

## CONCLUSION

¶42     Civil commitments are massive curtailments of liberty, and citizens have the inherent right to be free from unjustified commitments.  That applies equally, or perhaps more so, to the right to be free from orders for the involuntary administration of medication and treatment.  In this appeal, the issues centered upon two topics:  stipulations by persons in need in a civil commitment and the sufficiency and specificity of dangerousness findings by the trial court.  These two issues are necessarily intertwined.  L.A.T. challenges the stipulation she made in the middle of her WIS. STAT. ch. 51 jury trial.  That stipulation, however, was made knowingly, intelligently, and voluntarily by L.A.T.  It stands.  Moreover, this court declines to mandate that trial courts must conduct a colloquy on the record with each person entering a stipulation in a civil commitment case.

¶43     This court further concludes that while *D.J.W.*'s requirement for specificity of which level and type of dangerousness is found applies to initial

commitments and not just recommitments, the trial court did not err when it did not specify a dangerousness provision. L.A.T. may not enter an agreement stipulating dangerousness and then argue that the trial court was in error for relying upon that concession when entering the appropriate orders. Accordingly, this court affirms, in its entirety, the trial court's order committing L.A.T. and the corresponding order for involuntary administration of medication and treatment.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.